IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DAVID A. SCHLEMM,

|                    |                        |
|--------------------|------------------------|
| Plaintiff,         | OPINION AND ORDER      |
| v.                 | 11-cv-272-wmc          |

MATTHEW J. FRANK, EDWARD
WALL and PHIL KINGSTON,

Defendants.

---

State inmate David A. Schlemm filed this civil action pursuant to 42 U.S.C. § 1983, alleging that certain prison policies have unduly burdened the right to practice his Native American religious beliefs in violation of the First Amendment Free Exercise Clause and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1.  Defendants now move for summary judgment and dismissal of Schlemm's claims.   (Dkt. # 36.) Schlemm has filed a response.  After considering all of the pleadings, the exhibits and the applicable law, the court now reconsiders and vacates its previous decision denying defendants' motion for partial summary judgment on the issue of exhaustion.  For reasons discussed further below, the court will now grant that motion along with defendants' pending motion for summary judgment on the merits of Schlemm's exhausted claims.

BACKGROUND

Schlemm is presently incarcerated by the Wisconsin Department of Corrections ("DOC") at the Green Bay Correctional Institution ("GBCI").  From July 12, 2005, through

1

April 30, 2007, Schlemm was confined at the Waupun Correctional Institution ("WCI").  At the time this complaint was filed in 2011, Schlemm was confined at the Wisconsin Secure Program Facility ("WSPF") in Boscobel.

The lead defendant is Matthew J. Frank.  Frank was Secretary of the DOC until September 1, 2007, when he became Secretary for the Wisconsin Department of Natural Resources and Rich Raemish took over as DOC Secretary.  Defendant Edward Wall is the current DOC Secretary.  Defendant Phil Kingston was the Warden at WCI from December 2004 through March 31, 2007.

Schlemm contends that several prison policies have restricted or unduly burdened his right to practice his Native American religious beliefs.  To properly address these claims requires a brief overview of the policies that govern religious programming at facilities administered by the DOC Division of Adult Institutions ("DAI") and the requests made by Schlemm for new religious services or property items pursuant to these policies.

POLICIES ON RELIGIOUS PRACTICE, PROPERTY AND DIET

DAI has three main policies concerning inmate religious beliefs and practices, property and diet.[1]  First, Policy No. 309.61.01, entitled "Religious Beliefs and Practices," establishes general guidelines and opportunities for "congregate services" having the purpose of "worship and spiritual expression embracing a wide range of religious beliefs."  (Dkt. # 18, Exh. 1000.)

---

[1] These policies replace "Internal Management Procedures" that previously governed inmate religious practice, property and diet.  *See Charles v. Verhagen*, 220 F. Supp. 2d 937 (W.D. Wis. 2002).

This policy also regulates special events and activities open to all inmates regardless of their designated religious preference and congregate religious study groups.

Second, Policy No. 309.61.02, entitled "Religious Property," establishes general guidelines for the possession of personal religious property items.  (Dkt. # 18, Exh. 1001.) This includes the use of emblems and religious publications.  Pre-approved religious property items are identified in Policy No. 309.61.02 in an attached "Religious Property Chart." (Dkt. # 73, Exh. 1011.)

Third, Policy No. 309.61.03, entitled "Religious Diets," makes certain religious diets available through standard menu alternatives as resources permit for inmates whose religious beliefs require the adherence to religious dietary laws.  (Dkt. # 18, Exh. 1002.)  Pursuant to this policy, DOC offers:  a Halal diet for adherents to Islamic law; a Kosher diet for inmates who identify their religious preference as Jewish; and a plant-based vegetarian meal for any inmate who professes a religious adherence to vegetarianism.  Inmates of any faith may also simply choose to receive the "general fare menu" and self-select to avoid certain foods for religious or secular reasons, such as personal taste or health-related preferences.

These DAI policies govern religious programming through a structure composed of "Umbrella Religion Groups" or URGs, which identify seven faith traditions to accommodate groups with similar beliefs and practices.  The seven identified URGs include: Catholic, Eastern Religions, Islam, Judaism, Native American, Pagan and Protestant.  The seven identified URGs were designed to reflect the broad faith traditions in Wisconsin and its

3

inmate population, as well as to represent and incorporate the wide range of URG denominations/sub-groups.

Currently, DOC has over 22,000 inmates.  Of these, 89% have made their religious preference known by selecting one of the seven URGs.

Inmates have a right to declare a religious preference at any time while incarcerated in a DAI facility, either at an intake interview or by filing a DOC-1090 "Religious Preference" form. That form encourages inmates to identify a particular URG, or to indicate "Other" or "No Preference," depending on what most closely matches their religious beliefs and practices.  An inmate's URG designation dictates which services or studies he may attend and which religious property or diet he may obtain.  Regardless of URG designation, inmates may also engage in individual practice or study related to any faith.  They may also change their religious preference designation every six months, if desired.

An inmate seeking new or additional religious practices or property items that are not currently offered at his facility of assignment must file a form DOC-2075.  (Dkt. # 18, Exh. 1003.)  That form instructs inmates that:

> If you want to start a new religious practice activity that is not offered at the facility now [and] that involves other offenders, affects your physical appearance or [affects] the operation of the facility, you need to complete this form and send it to the Chaplain/Superintendent requesting permission as required by DOC 309.61, Wis. Admin. Code.

(*Id*.)

Requests made pursuant to a form DOC-2075 are directed to the unit chaplain or his designee.  The chaplain may make a recommendation to his supervisor, which is then

forwarded to the Religious Practice Advisory Committee ("RPAC") Executive Committee. The RPAC Executive Committee considers the recommendation before making a final decision on the request.  Since 2006, the RPAC has reviewed and processed 812 requests for individualized religious practices.  Denials pertaining to DOC-2075 requests must be appealed to the Inmate Complaint Review System ("ICRS").

## SCHLEMM'S RELIGIOUS BELIEFS AND PRACTICES

Schlemm belongs to a Navajo tribe and participated in Native American practices such as sweat lodge ceremonies, pipe ceremonies and powwows before coming to prison. (Dkt. # 35, Dep. of David A. Schlemm, at 11, 13-17.)  As a DOC inmate, Schlemm practices a traditional Native American religion and is a member of the Native American URG.

As a participant in the Native American URG at GBCI, it is undisputed that Schlemm is provided with various congregate Native American activities, including a 3.75 to 4 hour sweat lodge ceremony once per a month (DFOF ¶¶ 165, 170), a shared meal after the sweat lodge ceremony (DFOF ¶¶ 172-173), weekly pipe and drum ceremonies that last approximately 80-90 minutes and include smoking the ceremonial pipe (DFOF ¶¶ 180, 183-184), and other group Native American teachings (DFOF ¶ 179).  Schlemm is also able to participate in the Native American annual feast/celebration meal, which consists of a selected preferred meal from the regular menu rotation.  (DFOF ¶¶ 22-24.)  Finally, Schlemm is also able to possess for personal and/or group use an abalone shell, cedar, a ceremonial pipe and

bag, an eagle feather or red-tail hawk feather, a medicine bag, sage, sweetgrass, kinick kinick/sacred tobacco, and other sweat lodge items.  (DFOF ¶ 91.)

Defendants note that there are other ways for inmates to exercise their faith apart from the congregate services and property items afforded to a particular URG.  In particular, an inmate may exercise his Native American religious beliefs and practices in the following ways: (1) religious diet requests; (2) individual study; (3) personal meditation; (4) utilization of religious books and literature; (5) individual religious observance in his living quarters; (6) correspondence with fellow believers; (7) pastoral visits; and (8) requesting to abstain from work or a program on religious days of observance.  (DFOF ¶ 20.)

SCHLEMM'S REQUESTS FOR NEW SERVICES AND PROPERTY ITEMS

On May 29, 2008, Schlemm filed a DOC-2075 while assigned to GBCI, asking to wear a headband or handkerchief every day or during ceremonies such as the Pipe & Drum, Sweat Lodge and other special occasions.  (Dkt. # 18, Exh. 1004.)  The DOC-2075 included a letter that Schlemm wrote to then-GBCI Warden Michael Baenen, asking that he be allowed to wear a handkerchief comprised of six universal colors pointed in four directions or brought together in a circle to form a "medicine wheel."  Schlemm explained that each color had symbolic significance, as follows: "blue - - sky or deity; red - - power or strength; green - - mother earth; white - - purity; yellow - - corn pollen road; and black - - darkness."  Schlemm also advised Warden Baenen that wearing colorful headbands was recognized as a religious practice by the United States Bureau of Prisons.

The unit chaplain at GBCI acknowledged that headbands were historically part of Native American culture, but did not endorse or recommend granting Schlemm's request for multiple reasons, not the least of which was the security concern posed by religious emblems and colored headgear in relation to prison gang identification or affiliation:

> Headbands have been part of Native American culture and religion/spirituality for hundreds of years.  The six colors depict the four directions, the sky and the earth.  Various attributes have been linked with the directions.  However, Native American religious/spiritual teachings were handed down orally, never codified.  Thus, the attribution of directions and other meanings to the individual colors is highly subjective and individualistic, varying from tribe-to-tribe and person-to-person.  A major penological concern would be the colors of the headbands.  Black, red, yellow, blue, green, either alone or in combination, are colors closely associated with security threat groups.  DOC disallowed colored clothing (T-shirts, caps, kufis, yarmulkes, etc.), Islamic prayer beads and Catholic rosaries because they were used as gang identifiers (cf. DAI 309.61.01 IV E).  Also, the federal Bureau of Prisons Technical Reference [M]anual is used for background purposes only, according to several meetings I've had with the BOP administrator and assistant administrator of chaplaincy services; this isn't the daily policy/procedure followed by BOP.  As one Native American said:  "To me, if you're Indian, you're Indian.  You don't have to put on your buckskin, beads, and stuff like that.  The most important thing that determines who we are is on our insides, not our outsides.  If we are Indian inside, that's all that matters.  Being Indian means to think right, to be spiritual and to pray.  Feathers and beads don't make us Indian.  Being Indian means to have a good heart and a good mind."

(*Id.*)

Relying on the chaplain's assessment, the program director declined to support Schlemm's request for a multicolored headband for two reasons.  First, he did not believe that wearing such a headband was mandated by Native American religion.  Second, he believed that multicolored headgear could pose a threat to institutional security given that colors were "gang related."  (*Id.*).

After review, a DAI official in the central office also recommended denying Schlemm's request based on the security concerns noted by the chaplain and the program director. In addition, the official observed that "[a]ppropriate use of resources requires limits on allowable property items, especially those which have not been identified as necessary by the DOC religious advisor." (*Id.*). Based on these recommendations, the RPAC denied Schlemm's request for a multicolored headband.

On October 22, 2009, Schlemm filed another DOC-2075 while confined at WSPF, asking that Indian tacos made of "ground beef, diced tomatoes, diced onions, [and] shredded lettuce" be served along with "fry bread, fresh fruit/melons, and fruit pies" for the annual Native American Ghost Feast. (Dkt. # 18, Exh. 1005). The unit chaplain noted that DAI policy required feasts to consist of regular institution meals. (*Id.*) He noted further that Native American inmates were offered beef stew and brisket as their feast. (*Id.*) After the program supervisor offered no further comment, a DAI official in the central office recommended denying the request, noting that Schlemm asked to change the DAI menu for the institution based on one religious group practice. (*Id.*) The official also noted that the policy authorized feasts, but not specific foods. (*Id.*) In addition, the official found that Schlemm failed to provide sufficient evidence that Indian tacos were required by the Native American religion or that the meal provided was inadequate to meet his needs. (*Id.*) Based on these recommendations, the RPAC denied Schlemm's request for an annual feast consisting of Indian tacos.

On October 1, 2010, Schlemm submitted a similar DOC-2075 while confined at WSPF, this time asking that Indian tacos made of "deer meat, diced tomatoes, diced onions, [and] shredded lettuce" be served along with "fry bread, fresh fruit/melons, and fruit pies" for the annual Native American Ghost Feast. (Dkt. # 18, Exh. 1006.) Schlemm explained that the harvest season (October/November) was a time in which Native Americans honored their ancestors' spirits. Observing that the Ghost Feast was "equally important to Native American culture as Pipe & Drum or sweat lodge ceremonies," Schlemm described the Ghost Feast as "an opportunity to give back, pray and honor our people through the offering of food." (*Id*.). In support of that request, Schlemm provided an unsworn declaration from an individual named Roy Red Hail, who described himself as a "Native American spiritual advisor for the Department of Corrections." (*Id*.) Hail stated that Native American inmates needed to have "some traditional/familiar/spiritual food present" during the Ghost feast, such as Indian tacos. (*Id*.) Hail added that without "Native American traditional/familiar foods" present, the annual meal was "[neither] a Ghost Feast nor a Spiritual Gathering." (*Id*.)

The unit chaplain again noted that policy required feasts to consist of regular institution meals. He observed that past feasts for Native Americans had included beef stew from the institution menu and he recommended that this continue to be the case for Ghost feast. The program director agreed with the unit chaplain, as did the DAI official who reviewed the DOC-2075 in the central office. The official noted further that state funds could not be used for any special food items that are not part of "regular facility fare." In addition, "[f]air and equitable distribution of resources requires uniform feast guidelines

across umbrella groups." Based on these recommendations, the RPAC denied Schlemm's request for an annual feast consisting of Indian tacos featuring deer meat.

On March 30, 2013, after filing his suit in this case, Schlemm submitted another DOC-2075 while confined at GBCI, repeating his request for Indian tacos made with deer meet at the Ghost feast. (Dkt. # 18, Exh. 1007.)  In support of that request, Schlemm submitted the same declaration from Roy Red Hail, a 1993 internal memorandum from a social worker to the DOC Treatment Director about limitations imposed on Native American inmates, and a page from a Bureau of Prisons memorandum on Native American religious beliefs and practices.

The unit chaplain once again recommended denying the request in light of the prison policy that requires celebratory meals to come from the regular menu, among other concerns based on inmate health, safety and security:

> Inmate Schlemm #198339 is asking that a Ghost Feast be allowed at GBCI. He writes [that] the feast is to honor the ancestors and spirits during the harvest season. True enough. However, a Ghost Feast doesn't stand alone; there is a special Ghost ceremony (Sweat Lodge) that must go along with it. Otherwise, it isn't a Ghost Feast. Only select Native American elders [who] are chosen by their tribes may conduct such ceremonies. Our Native American leaders don't have such standing. In place of a Ghost ceremony, our Native American advisor, the past two years, has conducted a ceremony honoring the ancestors at a location on the reservation. As one of our Native American advisors said, it isn't about the food, it's about remembering and honoring the ancestors. Secondly, DAI Policy # 309.61.01 (II)(F)(5) states "An approved celebratory meal will consist of a regular institution/center meal. Food service may accommodate the celebration by switching the entire institution/center menu for that day with another meal from within the menu rotation." This is for health, safety and security reasons. Finally, the Federal Bureau [of] Prisons document cited is a technical background document, not administrative policy followed within the institutions. Schlemm cites a section

10

referring to a Pow-Wow, not ceremonial meals. The document cited has been updated.  Recommend denial.

(*Id.*)

The program supervisor and a DAI official from the central office again agreed with the unit chaplain's assessment for the same reasons given in 2009 and 2010.  The DAI official also noted that wild game was not approved for service to the entire institution as part of the regular meal plan:

> Wild game meat products are not part of the consolidated menu, nor are they contained in any institution signature menu items.  Policy does not allow foods from outside the institution due to food safety issues, potential for tampering with food products and limited food service resources (time, space, cooking vessels, etc.).

This official also reminded Schlemm that with 30 days' notice the applicable policy (No. 309.61.01) permits chaplains and food service staff to work with inmates to select a preferred meal from the regular menu rotation to be served to the entire institution on the URG feast date.  In that respect, inmates may request that a meal from this menu be served for their annual celebratory meal or special religious observance under the terms of the policy.[2]

### SCHLEMM'S CLAIMS

On November 20, 2012, the court granted Schlemm leave to proceed with several claims concerning whether the DOC policies on religious practice, property and diet have unduly restricted the exercise of his Native American religious beliefs.  In particular,

11

Schlemm was allowed to proceed with claims that: (1) Native American sweat lodge ceremonies should occur on a weekly basis, rather than a monthly one; and (2) the annual Native American celebratory meal known as Ghost Feast should include "Indian tacos," consisting of buffalo meat, venison or other wild game, diced tomatoes, diced onions, shredded lettuce, fry bread, and wild rice. In addition, the court granted Schlemm leave to proceed with several claims that the prison policy on religious property unfairly restricted his ability to possess and smoke a personal pipe in his cell or to wear headgear in the form of a bandana or to possess other items of traditional dress, including a "ribbon shirt" and bear-claw jewelry, which he claims are expressions of his Native American faith.

Schlemm seeks money damages from Frank and Kingston for violations of the First Amendment and injunctive relief from Wall only under the RLUIPA and the First Amendment.

Defendants now move for summary judgment, arguing that Schlemm fails to show that his rights were substantially burdened in violation of the RLUIPA or the First Amendment Free Exercise Clause. Citing their lack of personal involvement, defendants Frank and Kingston argue that they are entitled to qualified immunity from Schlemm's claims for money damages. Wall argues that he is entitled to relief from Schlemm's request for injunctive relief because Schlemm fails to establish a violation of federal law. Before addressing these arguments, the court will revisit defendants' motion for partial summary

---

[2] On August 31, 2012, Schlemm filed one other DOC 2075 while confined at GBCI (dkt. # 18, Exh. 1008), but this request, which asks for permission to order a special case to protect his eagle feather, does not pertain to any of the claims made in this case.

judgment regarding whether plaintiff exhausted his administrative remedies as required before filing suit.

OPINION

The purpose of summary judgment is to determine whether the parties have gathered and can present enough evidence to support a jury verdict in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). Summary judgment is appropriate if there are no genuine disputed material facts, and if on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The applicable substantive law will dictate which facts are material. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). A factual dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Roger Whitmore's Auto. Serv., Inc. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005).

In determining whether a genuine issue of material fact exists, the court must construe all facts in favor of the nonmoving party. *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). Even so, the non-movant may not simply rest on the allegations in his pleadings; rather, he must respond by presenting specific facts that would support a jury's verdict in his favor on his claims. *Hunter v. Amin*, 583 F.3d 486, 489 (7th Cir. 2009); *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005). This Schlemm has not done.

I.     **Exhaustion of Administrative Remedies**

As noted above, inmates who seek new or additional religious practices that are not currently offered at his facility of assignment are instructed to file a form DOC-2075, which is then evaluated by the unit chaplain, his supervisor, and the RPAC Executive Committee. Defendants previously moved for summary judgment on the grounds that Schlemm had only filed DOC-2075 forms regarding (1) his request to wear multicolored headgear and (2) his request for venison or deer meat at the annual celebratory meal known as Ghost Feast. Schlemm concedes that he did not make formal DOC-2075 requests for weekly sweat lodge ceremonies, the right to possess and smoke a personal pipe, or the right to wear traditional attire in the form of a ribbon shirt or bear-claw jewelry as an expression of his religious beliefs. As a result, defendants note that the RPAC has never had the opportunity to review, investigate, or make informed recommendations concerning those requests.  (Dkt. # 18, Affidavit of Kelli R. Willard West, at ¶ 10).

The PLRA prohibits any civil action by a prisoner in federal court under 42 U.S.C. § 1983 concerning "prison conditions" until "such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  The exhaustion requirement found in § 1997e(a) applies to all inmate suits about prison life, "whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The Supreme Court has repeatedly emphasized that § 1997e(a) mandates exhaustion of all administrative procedures before an inmate can file any suit challenging prison conditions.  *See Booth v. Churner*, 532 U.S. 731, 739 (2001); *Woodford*

*v. Ngo*, 548 U.S. 81, 85 (2006); *see also Jones v. Bock*, 549 U.S. 199, 212 (2007) (confirming that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court").

Ordinarily, DOC inmates are required to exhaust administrative remedies by pursuing a grievance through the Inmate Complaint Review System ("ICRS"), which sets out the administrative process available to prisoners with complaints about prison conditions. *See* Wis. Admin. Code DOC § 310.  It is evident from the summary judgment record, however, that the RPAC is not directly involved in responding to ICRS grievances.  (Dkt. # 42 Aff. of Michael Mohr and attached grievances).  Instead, the ICRS process is employed only as an appeal from the denial of a request submitted in a DOC-2075, and then only to consider whether the inmate's request was reviewed by the appropriate staff outlined in the applicable DAI policy and made with due consideration.  (*See id*.)

As summarized above, there is no DOC-2075, ICRS grievance or other administrative response in the record to Schlemm's request for weekly (or bi-weekly) sweat lodge ceremonies, as reportedly recommended by one of DOC's own spiritual advisors (Bryan Krist).  Likewise, there is no DOC-2075, ICRS grievance or other administrative response to Schlemm's request for a ribbon shirt crafted by an authorized spiritual advisor or his request to sport a "blunted" bear-claw on his medicine bag.  Absent a formal request in a form DOC-2075, these claims were not processed in compliance with procedures that were developed for the express purpose of determining how best to accommodate Schlemm's right to express his religious beliefs consistent with DOC policy.

The Supreme Court has emphasized that the exhaustion requirement found in the PLRA, 42 U.S.C. § 1997e(a), mandates "proper exhaustion," *Woodford v. Ngo*, 548 U.S. 81, 93 (2006), which demands compliance with prison procedural rules.  As the Supreme Court has recognized, "Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter*, 534 U.S. at 524.  By requiring exhaustion, Congress hoped that "corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation." *Id.* (citing *Booth*, 532 U.S. at 737).  In addition to filtering out potentially frivolous claims, Congress also believed that internal review would help facilitate the adjudication of cases ultimately brought to court by giving prison officials an opportunity to develop an administrative record that clarifies the contours of the controversy. *Id.* (citations omitted).

The Seventh Circuit has also held that a prisoner fails to exhaust remedies where he fails to take advantage of specific procedures for obtaining review of his claims. *Cannon v. Washington*, 418 F.3d 714, 718 (7th Cir. 2005).  In that respect, "[t]he exhaustion requirement is strictly enforced, in part because it allows prison officials to promptly correct errors internally and to develop a factual record before a case moves to federal court." *Canady v. Davis*, 376 F. App'x 625, 626 (7th Cir. 2010) (citing *Ngo*, 548 U.S. at 94; *Smith v. Zachary*, 255 F.3d 446, 450–51 (7th Cir. 2001)).

16

If allowed to bypass the procedures for requesting religious services and property items by filing a DOC-2075, then the incentive that § 1997e(a) provides for prisoners to use this available administrative remedy will disappear. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). In effect, it would allow prisoners to circumvent or "thumb their noses at the specified procedures" for requesting an accommodation based on religious rights. *Id.* Such a position would also be contrary to the purpose of the exhaustion requirement articulated at 42 U.S.C. § 1997e(a): to "eliminate unwarranted federal-court interference with the administration of prisons," by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Ngo*, 548 U.S. at 93 (quoting *Nussle*, 534 U.S. at 25); *see also Booth*, 532 U.S. at 739.

While denying defendants' orginal motion for partial summary judgment on the issue of exhaustion without prejudice, the court now concludes upon reconsideration that exhaustion of the DOC-2075 procedure is required in order to give prison officials the opportunity to develop a record regarding an inmate's request for religious accommodations. By deliberately bypassing the DOC-2075 process in this case, Schlemm deprived prison officials of the opportunity to respond meaningfully to his requests for weekly sweat lodge ceremonies, the right to possess and smoke a personal pipe, or the right to wear a ribbon shirt and bear-claw jewelry for religious reasons. Allowing for administrative investigation and resolution of Schlemm's requests in response to a DOC-2075 form will facilitate adjudication in the future, if necessary, in the event that such a request is made and a properly exhausted claim reaches federal court.

To the extent that Schlemm did not make a formal request using a DOC-2075 form, he failed to adequately exhaust available administrative remedies with respect to his request for weekly sweat lodge ceremonies, the right to possess and smoke a personal pipe, and the right to wear a ribbon shirt or bear-claw jewelry for purposes of his Native American religious beliefs.  Accordingly, the court will vacate its prior decision and will now grant defendants' motion for partial summary judgment pursuant to 42 U.S.C. § 1997e(a) with respect to his unexhausted claims.

## II.   Claims Against Frank and Kingston

Defendants Frank and Kingston also argue that they are entitled to qualified immunity because they were not personally involved in any of the decisions that form the basis of Schlemm's claims in this case.  Governmental actors performing discretionary functions enjoy "qualified immunity," meaning that they are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Estate of Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010) (quoting *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007)).

As noted previously, all inmate requests for new religious practices are directed to a unit chaplain or the chaplain's designee.  (Dkt. # 18, Aff. of Kelly R. Willard West, at ¶¶ 5-6).  The chaplain makes a recommendation to his supervisor and to the RPAC, which reviews and processes the request before making a final recommendation.  The record establishes that neither Frank nor Kingston had any involvement in the RPAC or with the DOC-2075

18

requests filed by Schlemm.  Thus, they are named as defendants in their supervisory capacity only, as the former Secretary of DOC and former warden at WCI, respectively.

Supervisors may not be vicariously liable for the conduct of their subordinates. *See Vance v. Rumsfeld*, 701 F.3d 193, 203 (7th Cir. 2012) (en banc), *cert. denied*, 133 S. Ct. 2796 (2013). In that regard, "knowledge of subordinates' misconduct is not enough for liability. The supervisor must want the forbidden outcome to occur." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009)).  A supervisor may be liable under § 1983 for failing to stop others from committing unconstitutional acts, but only if that officer had a reasonable opportunity to prevent the misconduct. *George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007); *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005); *Fillmore v. Page*, 358 F.3d 496, 505-06 (7th Cir. 2004).  Absent allegations that a supervisory official personally caused, participated in, or had a reasonable chance to stop the alleged harm from occurring, a plaintiff fails to establish liability on a the part of that supervisory official. *George*, 507 F.3d at 609.

As summarized in more detail above, Schlemm did not file his first formal DOC-2075 request for new religious services or property items until 2008, when he was at GBCI. Schlemm does not allege any facts showing that Kingston, as former warden at WCI, had anything to do with those requests.  Beyond identifying Frank as a policymaker for DOC until September 2007, Schlemm also offered no evidence permitting even an inference, much less demonstrating, that he had any involvement in the underlying requests for new religious practices or property items.   This is insufficient for purposes of liability under 42 U.S.C. § 1983.  Accordingly, defendants' motion for summary judgment on this issue is granted.

19

### III.   RLUIPA

The Religious Land Use and Institutionalized Persons Act ("RLUIPA), 42 U.S.C. § 2000cc-1, prohibits the government from imposing "a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the burden furthers "a compelling governmental interest," and does so by "the least restrictive means." *Cutter v. Wilkinson*, 544 U.S. 709, 714-15 (2005). The protections afforded by RLUIPA apply where:

1) the substantial burden is imposed in a program or activity that receives Federal financial assistance; or

2) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes.

42 U.S.C. § 2000cc-1(b).  There is no dispute that Schlemm's claims, if true, meet this RLUIPA threshold.

Of course, to prevail on a claim under RLUIPA, Schlemm must also establish that the defendants placed a substantial burden on the exercise of his religious beliefs.  *See* 42 U.S.C. § 2000cc-2(b); *Hernandez v. Comm'n of Internal Revenue,* 490 U.S. 680, 699 (1989).  For purposes of the RLUIPA, a substantial burden is "one that necessarily bears a direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable." *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003).  If Schlemm shows that the actions of government officials have substantially burdened the exercise of his religious beliefs, then the burden shifts to the defendants to demonstrate that their decision was the least restrictive means of furthering a compelling government interest. *Cutter*, 544 U.S. at 712.

20

### A.  Prohibition on Wild Game at an Annual Celebratory Feast

As noted above, Schlemm is requesting Indian tacos to be served at the Native American annual celebratory Ghost Feast to honor the spirit of his ancestors.  According to Schlemm, the feast at a minimum must include deer meat or wild game.

Defendants acknowledge that DAI policies impose limitations on Schlemm's religious exercise where his request for a particular celebratory meal is concerned, particularly the requirement that annual celebratory feasts for each URG consist of a meal from the regular menu.  Although Native American "Spirit Foods" (consisting of dried corn, dried berries, dried meat, nuts in a vendor-sealed, clear plastic package) are authorized in small quantities during congregate religious services,[3] such as sweat lodge ceremonies, the policy does not otherwise allow for special meals or foods of cultural significance to be served at any of the annual religious celebratory meals, which must be prepared and served to the entire inmate population.  (Dkt. # 38, Affidavit of Christine Althaus.)  While institution staff will work with the URG to switch the institution meal that day with another that more closely resembles the feast's traditional foods, wild game is not allowed as a celebratory meal due to food safety issues, limited food services staff time and resources.  (*See id.*).

In the past, Native American inmates have been provided with beef stew or brisket from the regular menu for their annual celebratory meal.  (Dkt. # 18, Exh. 1005.)

---

[3] Similarly, the Religious Property Chart attached to DAI Policy 309.61.02 allows bread to be used for Protestant and Pagan congregate services and also authorizes a Seder Plate for inmates in the Jewish URG for use at congregate Passover observance.  (Dkt. # 43, Exh. 1010).  The Seder Plate must be brought in by a "Spiritual Leader" on the day of the service.  (*Id.*).  One plate, which must be "vendor-sealed" in a "commercially available package," may be shared among all participants.  (*Id.*).

Defendants maintain, therefore, that Schlemm cannot show that the restrictions on serving wild game impose a substantial burden such that his religious exercise is rendered effectively impractical.  The court agrees.  Although Schlemm would prefer to eat traditional wild game with his annual religious feast, he does *not* demonstrate that the exercise of his religious beliefs has been rendered effectively impracticable or that prison officials have substantially burdened his religious exercise by refusing to serve wild game.  *See Civil Liberties for Urban Believers*, 342 F.3d at 761; *see also Nelson v. Miller*, 570 F.3d 868, 879 (7th Cir. 2009) ("[A] prisoner's religious dietary practice is substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition").

Even assuming a substantial burden, defendants advance several compelling interests to support the restrictions on annual celebratory feasts and the prohibition against serving wild game as an institutional meal.  First, defendants note that it would be impossible to accommodate every religious group's preferred or culturally significant food choice because there is not always a consensus amongst the URG.  (Dkt. # 43, Supp. Aff. of Kelli R. Willard West, at ¶¶ 2, 12(a), 12(d).)  If one group is provided a special meal, others will also have to be accommodated.  (*Id*. at ¶ 7.)  This could also lead to favoritism, inmates reacting negatively, disturbances, and religion-shopping.  (*Id*. at ¶ 12(e)-(f).)

Second, DOC does not have the resources available to accommodate special foods for religious feasts.  DOC kitchens are set up for the highest efficiency because thousands of meals come through most institution kitchens on any given day; they are not equipped to provide catered or special meals.  (Dkt. # 38, Aff. of Christine Althaus, at ¶ 6.)  Food service

departments must work within budget and space constraints to prepare nutritional meals for all inmates.  (*Id.* at ¶ 7.)  Food service personnel at the institutions are constantly training and supervising inmate kitchen workers, who usually have very limited food service experience.  (*Id.* at ¶ 8.)  These demands leave little time to do anything extra that would deviate from an already tight schedule.  (*Id.*)  Likewise, requests for such foods can more than double meal costs.  (*Id.* at ¶¶ 13-14.)

Third, Schlemm's request, in particular, is problematic because DOC is prohibited from serving meat that is not USDA-inspected.  (Id. at ¶ 10.)  Donating this meat is not a viable option because donated meat poses serious health and safety concerns.  (Id. at ¶ 11.)  Specifically, DOC would not necessarily know whether the donated food had been prepared, stored or transported to the institution under sanitary conditions.  (*Id.*)   According to guidelines in the Wisconsin Food Code, the serving of venison or other wild game meat would also involve a long and laborious approval process, special handling as well as clean-up and would require notifying the whole institution that the food may not be safe to eat.  (*Id.* at ¶ 12.)  This may be upsetting to other inmates and could readily incite a riot.  (*Id.* at ¶ 15.)  Moreover, if there were a food-borne illness outbreak, DOC would be responsible for providing appropriate medical care and could face litigation.  (Dkt. # 43, Supp. Aff. Kelli R. Willard West, at ¶ 12(c).)

In weighing the governmental interests involved, the Supreme Court has urged deference to prison administrators. *Cutter*, 544 U.S. at 722-723.  Indeed, when applying

RLUIPA, "context matters in the application of that standard." *Id*. As the Supreme Court emphasized,

> [w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests.

*Id*. at 722. In light of the compelling governmental interest in prison security, courts must also review RLUIPA claims with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources." *Id*. at 723 (citation omitted).

Equitable allocation of scarce financial resources is a compelling governmental interest. *See Cutter*, 544 U.S. at 726 (under RLUIPA, if request is "excessive, impose[s] unjustified burdens on other institutionalized persons, or jeopardize[s] the effective functioning of an institution, the prison [is] free to resist the imposition"); *see also Chance v. Texas Dep't of Crim. Justice*, 730 F.3d 404, 414 (5th Cir. 2013) (holding that limitations on Native American services based on the availability of volunteers were the least restrictive means of furthering the "compelling interests in prison administration, resource allocation and cost control").

Maintaining safety and order in prison is also a compelling governmental interest that has been held to justify the ban on serving foods prepared outside of the institution for annual celebratory feasts. *See Skenandore v. Endicott*, No. 05-cv-234, 2006 WL 2587545, *20 (E.D. Wis. Sept. 6, 2006) ("The defendants have also met their burden of justification by

showing a compelling state interest in preventing the use of foods prepared outside the institution."); *West v. Overbo*, No. 03-cv-658, 2008 WL 336394, *12 (E.D. Wis. Feb. 5, 2008) (DOC's "policy requiring institution meals to be served at religious feasts serves their legitimate penological interests in maintaining institutional security and protecting inmates from potential harm from improperly prepared food").

Schlemm neither disputes that the restrictions on celebratory meals are based on principles of food safety, security and sound fiscal resource allocation, nor demonstrates that defendants have not utilized the least restrictive means possible to further these compelling interests.  Accordingly, he has failed to advance sufficient evidence to establish a violation of RLUIPA in connection with the defendants' refusal to serve wild game during an annual celebratory feast.  Therefore, defendants are entitled to summary judgment on this issue.

### B.  Multicolored Headbands or Handkerchiefs

Schlemm also seeks to mandate his right to wear multicolored headbands, handkerchiefs or bandanas as headgear while practicing his religious beliefs in his cell and during congregate Native American services.  While handkerchiefs are allowed under the current religious property policy, they can only be white in color.  (Dkt. # 73, Aff. of Catherine A. Francois, at ¶ 5, Exh. 1011.)  Schlemm further testified during his deposition that these handkerchiefs do not meet his religious needs.  (Dkt. # 35, at 44-46.)

Even assuming that this limitation poses a "substantial burden" on Schlemm's beliefs, defendants maintain that restrictions on property items and traditional modes of dress, such as a multicolored handkerchief, are necessary because the wearing and displaying of certain

religious emblems and headwear create safety and security concerns.  (Dkt. # 41, Aff. of Peter Jaeger, at ¶ 25.)   Specifically, certain religious emblems and colored headwear are recognized as gang identifiers.  (*Id*.)  For example, the color red is utilized to identify the nationally known gang, the Bloods, who are rivals of such other nationally known gangs, like the Crips and the Black Gangster Disciples.  (*Id*. at 40.)  Displaying religious emblems and known gang symbols or colors may cause an inmate to act out against another inmate wearing a symbol or color of a rival gang.  (*Id*. at ¶ 36.)  Similarly, religious emblems and colored headwear that are not currently a recognized gang identifier could be adopted by a gang or unsanctioned group, because such groups are always looking for ways to distinguish themselves in the prison environment.  (*Id*.)

The Seventh Circuit has recognized that "suppressing gang activity to promote a secure and safe prison environment is indisputably a compelling interest." *Charles v. Frank*, 101 F. App'x 634, 636, 2004 WL 1303403, *2 (7th Cir. 2004) (citing *Bell v. Wolfish*, 441 U.S. 520, 546 (1979); *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974); *Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir. 1987); *see also Sasnett v. Sullivan*, 91 F.3d 1018, 1023 (7th Cir. 1996), *vacated on other grounds*, 521 U.S. 1114 (1997)).  Indeed, "modern-day courts recognize that gangs pose a 'serious challenge' to . . . institutional security." *Young v. Lane*, 922 F.2d 370, 376 (7th Cir. 1991) (upholding restrictions on headgear in an effort to limit the effectiveness of gangs, who try to identify their members by means of such visual aids).  Thus, prohibiting the display of religious emblems and colored items has been found to be the least restrictive means of furthering the compelling interest in suppressing gang identification.  *See*

*Skenandore*, 2006 WL 2587545, *21; *Shaw v. Norman*, 6:07-cv-443, 2009 WL 1780123 (E.D. Tex. June 22, 2009) (upholding a prison policy banning all colored prayer beads due to problems with gang affiliations).

For these reasons, the restriction on possessing headbands and other items of traditional Native American regalia have been upheld previously under the RLUIPA. *See Skenandore*, 2006 WL 2587545, *21 (upholding restrictions on the possession of headbands, ribbon shirts, jewelry, looms and shells for traditional Native American ceremonies). Again, Schlemm neither demonstrates otherwise nor shows that the prohibition on multicolored headgear is not the least restrictive means to further this compelling government interest in prison safety and institutional security. Accordingly, defendants are entitled to summary judgment on his RLUIPA claim.

## IV.   First Amendment - - Free Exercise

Finally, Schlemm contends that the restrictions imposed pursuant to the DAI policies on his religious practice, property and diet violate the First Amendment Free Exercise Clause. The Free Exercise Clause prohibits the state from imposing a "substantial burden" on a "central religious belief or practice." *Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013) (citations omitted); *see also Hernandez v. Comm'n of Internal Revenue*, 490 U.S. 680, 699 (1989) (citing *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir. 2003)). There are only two points that merit brief discussion with respect to Schlemm's allegations under the First Amendment.

First, the Supreme Court has held that regulations of general applicability, which are not intended to discriminate against a particular religion or religious sect, do not to violate the Free Exercise Clause. *Employment Division, Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 878-81 (1990); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993). Because the DAI policies on religious practice, property and diet are neutral and general in application, the state may enforce them without violating the First Amendment. *See Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006) ("The first amendment, [in contrast to the RLUIPA], does not require the accommodation of religious practice: states may enforce neutral rules."); *but see Lewis v. Sternes*, 712 F.3d 1083, 1085 (7th Cir. 2013) (noting tension between the Supreme Court's holding in *Smith* and prior decisions in *O'Lone v. Shabazz*, 482 U.S. 342 (1987) and *Turner v. Safley*, 482 U.S. 78 (1987)).

Second, to the extent that the regulations impose a burden on Schlemm's free exercise, the regulations may be justified if they are "reasonably related to legitimate penological interests." *O'Lone v. Shabazz*, 482 U.S. 342, 349 (1987) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Notably, "RLUIPA imposes a higher burden than does the First Amendment in that the statute requires prison regulators to put forth a stronger justification for regulations that impinge on the religious practices of prison inmates." *McFaul v. Valenzuela*, 684 F.3d 564, 575 (5th Cir. 2012) (quoting *Mayfield v. TDCJ*, 529 F.3d 599, 612 (5th Cir. 2008)); *see also Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 335 (5th Cir. 2009) (explaining that "RLUIPA, by directing that [courts] apply strict scrutiny, makes injunctive relief easer for [plaintiff] to obtain than it would be under the First Amendment").

Thus, any claim that fails under the RLUIPA invariably fails under the First Amendment. *See Mark v. Gustafson*, 482 F. Supp. 2d 1084, 1090 (W.D. Wis. 2006); *Perez v. Frank*, 433 F. Supp. 2d 955, 964 (W.D. Wis. 2006).

Because Schlemm failed to demonstrate that the restrictions on celebratory meals and the possession of multicolored headgear violate the RLUIPA, he similarly fails to establish that a violation of the First Amendment occurred or that defendants burdened a "central religious belief or practice" in violation of the Free Exercise Clause. Accordingly, the court need not address this issue further. *See Koger v. Bryan*, 523 F.3d 789, 801 (7th Cir. 2008) (observing that "'federal courts are supposed to do what they can to avoid making constitutional decisions and strive doubly to avoid making unnecessary constitutional decisions'") (citation and quotation omitted).

## ORDER

IT IS ORDERED that:

1. The order dated September 30, 2013, denying defendants' motion for partial summary judgment on the issue of exhaustion without prejudice (dkt. # 32) is VACATED.

2. Defendants' motion for partial summary judgment for failure to exhaust (dkt. # 16) is GRANTED. Plaintiff David Schlemm's claims concerning his request for weekly or bi-weekly sweat lodge ceremonies, the right to possess and smoke

a personal pipe, and the right to wear a ribbon shirt or bear-claw jewelry are DISMISSED  without prejudice for lack of exhaustion.

3. Defendants' motion for summary judgment on the merits of plaintiff's exhausted claims (dkt. # 36) is GRANTED.   Those claims are DISMISSED with prejudice.

4. The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 10th day of June, 2014.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge