IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

DAVID SCHLEMM,

     Plaintiff,                                      OPINION and ORDER

     v.                                            11-cv-272-wmc

EDWARD WALL,

     Defendant.

_____

     *Pro se* plaintiff David Schlemm turned to litigation after enduring years of what he perceived to be a growing disdain and disrespect for his and other inmates' Native American religious culture and traditions. When Schlemm filed this case in April of 2011, he accused the Wisconsin Department of Corrections ("DOC") of arbitrarily restricting his religious practices in numerous ways, including (1) denying him possession of certain religious property, (2) limiting participation in sweat lodges, and (3) failing to permit traditional spiritual foods at an annual Ghost Feast. Schlemm was permitted to proceed with claims under both the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). As the litigation progressed, however, Schlemm's claims have narrowed and become more focused to fit within the contours of First Amendment and RLUIPA law. By the time this case had gone through one round of summary judgment and an appeal, the only issues remaining for resolution by this court at trial were whether Schlemm was entitled under RLUIPA to: (1) eat venison Indian tacos during the annual Native American Ghost Feast; and (2) wear a multicolored headband or bandana containing the color red while

1

praying or meditating in his cell and during group religious ceremonies.  *See Schlemm v. Wall*, 784 F.3d 362 (7th Cir. Apr. 21, 2015).[1]

With respect to the multicolored headband, the state agreed before trial to allow Schlemm to possess and wear a multicolored headband while praying in his cell and during religious ceremonies.   Consistent with that accommodation, a permanent injunction regarding the headband will be entered as part of the order.  Because of this concession, the only issue remaining for trial concerned Schlemm's request for venison meat at the annual Ghost Feast.  A bench trial was held on this issue on March 21 and 22, 2016.  As discussed in more detail below, plaintiff established at trial that defendant violated his rights under RLUIPA by restricting his ability to obtain game meat and fried bread for use at an annual Ghost Feast.   The court will, therefore, enter an injunction requiring defendant to make accommodations that will permit plaintiff to obtain the traditional foods he needs to hold a meaningful Ghost Feast.

OPINION

## I.    Preliminary Matters

There were several matters that were resolved by the court shortly before trial.  First, plaintiff was offered an opportunity to have Perkins Coie LLP act as counsel during the trial. The court had recruited Perkins to represent plaintiff after the case was remanded given their

---

[1] When framed in this way, Schlemm's remaining requests may seem minor to those outside the prison system, although for Schlemm, as well as overtaxed officials and employees with the Wisconsin DOC (and elsewhere across the country), these requests are a part of more significant concerns regarding accommodations for religious traditions less familiar to prison administration, that have been heightened by RLUIPA's passage.

past willingness to represent other inmates on similar RLUIPA claims.  Later, the court granted counsel leave to withdraw due to fundamental disagreements between counsel and plaintiff over how to proceed.  Before trial, Perkins graciously offered to act as standby counsel for plaintiff, but he declined this help and chose to proceed *pro se* at trial.

Second, on the morning of trial, plaintiff requested assistance from another inmate, Johnson Greybuffalo, but that request was denied as being raised too late.

Third, a few days before trial, plaintiff had requested that the court issue subpoenas for a number of his proposed witnesses.  That request was denied as untimely.  (Dkt. #200.) In light of plaintiff's *pro se* status and the difficulties inherent in contacting witnesses from inside the prison, however, the court made efforts to contact all of the witnesses on plaintiff's witness list before the upcoming trial.  The court successfully made arrangements for several of plaintiff's witnesses to testify, including the expert that had been recruited and retained by plaintiff's then counsel, Dr. Deward Walker.[2]  Plaintiff's proposed witnesses Randy Cornelius and Roy Red Hail did not respond to the court's repeated efforts to contact them, however, so they did not testify at trial.

II.     **RLUIPA**

Turning to the substance of plaintiff's claim, RLUIPA prohibits the government from imposing "a substantial burden on the religious exercise of a person residing in or confined to an institution," unless "imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that

---

[2] The court also provided compensation to Dr. Walker for his trial testimony from the court's pro bono trust fund.

compelling governmental interest." 42 U.S.C. § 2000cc-1(a). RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," § 2000cc–5(7)(A), but "a prisoner's request for an accommodation must be sincerely based on a religious belief and not some other motivation." *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (citing *Burwell v. Hobby Lobby*, 134 S. Ct. 2751, 2774 n. 28 (2014)).

Courts have placed the initial burden on the plaintiff to show that he has a sincere religious belief and that his religious exercise was substantially burdened. *Holt*, 135 S. Ct. at 862; *Koger v. Bryan*, 523 F.3d 789, 797-98 (7th Cir. 2008); *Vision Church v. Village of Long Grove*, 468 F.3d 975, 996-97 (7th Cir. 2006). If the plaintiff is able to meet this threshold, the burden then shifts to the defendants to demonstrate that their actions further "a compelling governmental interest" by "the least restrictive means." *Cutter v. Wilkinson*, 544 U.S. 709, 712 (2005).

Consistent with this law, the parties agreed before trial that the disputed issues to be resolved were whether: (1) plaintiff's requests for venison at the Ghost Feast are motivated by sincerely held religious beliefs; (2) the DOC's policies substantially burdened his religious exercise; and (3) the DOC's policies are the least restrictive means of furthering a compelling government interest.

### A.        Sincerity of Plaintiff's Religious Beliefs.

The court has no trouble concluding that plaintiff's request for venison or other game meat at the annual Ghost Feast is motivated by a sincerely held religious belief. Plaintiff testified credibly at trial that: (1) the Ghost Feast is essential to his Native American religious practice and (2) traditional foods, including game meat, must be served for the feast.

4

(Trial Trans., day 1, at 53-54.)  Game meat could be venison, but may also be buffalo or wild turkey.  Other traditional foods that plaintiff believes should be present are fried bread, corn and berries.  (*Id.* at 57, 63.)  Plaintiff testified that without the traditional foods of game meat and fried bread, the Ghost Feast would lack religious significance for him.

Plaintiff called several witnesses that supported his testimony regarding the nature, purpose and significance of the Ghost Feast and of the presence of traditional foods, including game meat, corn and berries.  Jose Villarreal, a Native American inmate at Green Bay Correctional Institution, testified that the Ghost Feast was important to his identity as a Native American and that it was important to have wild game served at the feast.  (*Id.* at 23.)  Although Villarreal had attended numerous Ghost Feasts while incarcerated in the Wisconsin prison system, he declined to eat the non-game meat served at those feasts.  (*Id.* at 28.)

Johnson Greybuffalo, a Native American inmate at the Wisconsin Secure Program Facility, testified that:  (1) the purpose of the Ghost Feast is to honor one's loved ones that have passed; (2) traditional foods are a significant part of the ceremony; and (3) there needs to be some kind of game meat traditionally hunted by Native people -- such as buffalo, venison, bear meat, pheasant, or wild turkey -- as well as other traditional foods such as corn, water and fruit.  (*Id.* at 38-39, 41-42.)  In addition, plaintiff's expert, Dr. Walker, testified that the Ghost Feast is a traditional ceremony that celebrates and honors ancestors, who exercise important influence in the lives of tribal members.  The preparation and presentation of traditional foods, including corn, venison and bison, express an admiration, concern and love for ancestors.  (*Id.* at 94, 110.)  Walker explained that in addition to consumption of traditional foods, the ceremony generally includes praying to ancestors for guidance, healing

and protection.  If the traditional details are not followed, the ceremonies lose their value in providing the help, teaching and healing for the participants.  (*Id.* at 104.)

Finally, Robert Ryan Krist, a Native American spiritual advisor for the DOC, testified that he has advised the DOC regarding Ghost Feast traditions.  In particular, he has advised the DOC that the Ghost Feast is a traditional feast honoring the dead and that traditional foods must be present, including water, berries, corn, buffalo or venison, and frybread, if available.  (*Id.* at 115.)

All of this testimony support a finding that plaintiff's request for venison and fried bread is motivated by a "sincerely held religious belief" and that these foods are necessary components of the annual Ghost Feast.  This testimony also confirms that for plaintiff, as well as many other practitioners of Native American religious traditions, serving game meat and other traditional foods allows participants to honor and commune with their ancestors.

Although defendant attempted to challenge the sincerity of plaintiff's religious beliefs, and his request for venison in particular, its evidence does not undermine this finding.  First, defendant presented evidence that in 2008 and 2009, plaintiff asked the prison to serve Indian tacos made with *ground beef* at the Ghost Feast.  As part of these same requests, plaintiff stated that the tacos on the regular menu at GBCI could accommodate part of his feast food needs.  Second, defendant presented evidence that plaintiff chose not to attend the Ghost Feast in 2015, despite the fact that his recruited counsel and the DOC had made accommodations to ensure that he would have venison and an Indian taco at the feast.  Defendant's position is that these facts undermine plaintiff's testimony that venison is a necessary component of the Ghost Feast, and also raise questions whether the Ghost Feast itself is as important to his religious practice as he has claimed.

6

But plaintiff adequately explained at trial his requests for ground beef in 2008 and 2009, and his choice to skip the Ghost Feast in 2015.  Neither explanation was contrary to plaintiff's sincerely held religious beliefs regarding the Ghost Feast.  Plaintiff testified that he requested Indian tacos with ground beef in the past because he believed (probably correctly) that was all the prison would provide.  He also denied ever believing that ground beef tacos would satisfy his religious needs for a meaningful Ghost Feast.  With respect to the 2015 Ghost Feast, plaintiff found the timing and events planned for the ceremony rendered the Ghost Feast meaningless for him, despite the availability of venison.  In particular, plaintiff testified that the Ghost Feast should have been held in October or November, rather than in September when the 2015 feast was held, and the feast needed to include a sweat lodge, tobacco burning and spiritual songs.[3]

Both of these explanations are supported by documentary evidence in the record.  In particular, it is undisputed that in 2008 and 2009, the prison had ground beef available as part of the regular institution diet, but did not offer venison.  With respect to 2015, there is also evidence that plaintiff objected to the timing and content of the Ghost Feast before its occurrence.  Taken as a whole, the testimony and evidence presented at trial confirmed that plaintiff's requests for venison or other game meat and fried bread at the Ghost Feast have been motivated by sincerely held religious beliefs.

---

[3] Although the court permitted plaintiff to testify regarding his objections to the timing and activities in the context of explaining why he did not attend the 2015 Ghost Feast, plaintiff has not allayed RLUIPA claims regarding the timing and activities of the feast in this case.  That being said, Kelli-Willard West, religious policy coordinator for the DOC, testified that the Ghost Feast would be held at a later date beginning in 2016.  (Trial Trans., day 1, afternoon at 94.)

### B.   Substantial Burden.

The next question is whether plaintiff established that the DOC's policies affecting his ability to obtain venison and fried bread for the annual Ghost Feast impose a "substantial burden" on the exercise of his religion.  As noted in the Seventh Circuit's opinion remanding this case, the United States Supreme Court recently defined "substantial burden" as something that "seriously violates [one's] religious beliefs," regardless of whether alternative means of religious exercise are available.  *Schlemm*, 784 F.3d at 364-65 (quoting *Holt*, 135 S. Ct. at 862 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2775 (2014))).  The Seventh Circuit further advised that "seriously violates" means more than just a "modest" violation.  *Schlemm*, 784 F.3d at 365.  In other cases, the Seventh Circuit also explained that "substantial burden" results when the government "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs."  *Thompson v. Holm*, 809 F.3d 376, 379-80 (7th Cir. 2016) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 717-18 (1981)).  *See also Holt*, 135 S. Ct. at 862 (policy that forces a prisoner to choose between violating his beliefs and facing discipline is a substantial burden).

As an initial matter, the court concludes that a complete prohibition on game meat or fried bread at the Ghost Feast would substantially burden plaintiff's exercise of sincerely held religious beliefs.  As discussed above, plaintiff and all of his witnesses testified that the Ghost Feast is a significant part of plaintiff's and many other Native American's religious traditions and that having game meat and fried bread is essential to a meaningful Ghost Feast because without it, plaintiff and other participants cannot properly honor their ancestors.  Plaintiff's testimony also supports the conclusion that being unable to properly honor ancestors at the annual Ghost Feast would seriously violate his religious beliefs.

8

But this broad conclusion does not resolve the question whether *defendant's policies* substantially burden plaintiff's religious exercise.  That question is complicated by the fact that there are multiple policies affecting plaintiff's ability to consume venison at the Ghost Feast, some of which have changed over the life of this case.  When plaintiff filed this case in 2011, there were no policies in place that would have clearly enabled plaintiff, or anyone else, to bring game meat to the annual Ghost Feast.  Under the Division of Adult Institution's ("DAI") "Religious Diets" policy 309.61.03, which was in effect when this case was filed, each umbrella religious group *was* permitted to hold an annual congregate celebratory meal. The food for the annual feast, however, was taken from the regular institution menu, although inmates, through the chaplain, could request a particular meal from the regular weekly menu be served on the day of the event.  Even though the DOC was prohibited at the time from purchasing, preparing or subsiding ceremonial foods, an institution's food service staff and its chaplain frequently collaborated to swap the weekly menu so that the regular meal served on the day of the event would include foods that somewhat resembled those traditionally consumed during that particular celebratory feast.  Under this policy, the institution usually offered beef stew or brisket during the annual Ghost Feast celebration, but did not offer venison because game meat is not part of the regular institution menu.

The other relevant "policy" in place at the time this case was filed is the DAI "Religious Property Chart," attached to DAI 309.61.02, which identifies particular religious items, including food items, that inmates identifying under particular religious umbrella groups may possess.  Under the Property Chart effective at the time plaintiff filed suit, there was no provision allowing Native American inmates to bring any food to the annual Ghost Feast.  The only provision regarding food items for Native American inmates was found

under the "sweat lodge" category, which permitted "spirit foods" to be consumed during sweat lodge ceremonies.  Specifically, that provision allowed "Spirit Foods (e.g. dried corn, dried berries, dried meat, nuts) – vendor-sealed, clear plastic package(s), no more than 16 oz. total quantity.  Opened package(s) must be dispensed of or taken out at the conclusion of the sweat lodge ceremony."  (Trial Exh. 503.)  Because sweat lodge ceremonies do not always coincide with the Ghost Feast, however, even the provision of those food stuffs were not clearly permitted to inmates during the Ghost Feast.

In short, both the "Religious Diets" policy and the "Religious Property Chart" in effect when plaintiff filed suit in 2011 prevented plaintiff from obtaining venison or any other traditional foods for the Ghost Feast, *unless* already included on that institution's menu, which in the case of game meat in particular was highly unlikely.  Because these policies completely restricted plaintiff's access to game meat and fried bread for the annual Ghost Feast, they substantially burdened his religious exercise.  Indeed, if these were the policies currently in place, the court would easily conclude that defendant's policies substantially burdened plaintiff's religious exercise for purposes of establishing a RLUIPA violation.

In response to changes in the law and cases like this one, however, defendant amended the policies affecting religious property and food for religious celebratory meals, after plaintiff filed suit.  Since then, defendant has taken the position that the amended policies provide the accommodations to which plaintiff is entitled.  Not surprisingly, plaintiff disagrees.  Thus, the court must consider whether these amended policies substantially burden plaintiff's exercise of religious beliefs, or the new policies now provide adequate accommodation.

Effective December 15, 2015, and also amended again on April 1, 2016, DAI's Religious Property Chart permits "spirit foods" to brought and consumed at Native American group ceremonies, not just at the monthly sweat lodge.  Under the new Property Chart, the spirit foods must be "shelf-stable products (e.g. dried corn, dried berries, dried meat, nuts) in vendor-sealed, clear package(s)."  (Trial Exh. 503A.)  The policy also continues to limit the total quantity of spirit foods to 16 oz., and it requires that opened packages be disposed of or taken out at the conclusion of the ceremony.

Although the policy does not say so expressly, Kelli Willard-West, DOC's religious practices coordinator, testified that the spirit foods must be brought it by the spiritual advisor leading the ceremony, with any remnants being taken out by the advisor at the close of the ceremony.  (Tr. at 80, 91.)  Under this policy, the spiritual advisors may bring in dried meats, including venison, to the Ghost Feast.  (Tr. at 116.)

Effective January 1, 2016, DAI also implemented a new version of DAI Policy 309.61.03, "Religious Diets."  Under the new policy, DOC continues to provide inmates attending an annual, celebratory religious meal with the regular meal tray normally served at the institution that day, whether that is a medical diet tray, a religious tray or a general meal tray.  The meal trays are delivered to the location in the institution where the celebration is being held, so the participating inmates can eat together.  DOC will also continue to work with the chaplain to use items from the regular menu that most closely resemble traditional foods served at a religious celebratory meal.

Under the new policy, inmates attending a congregate religious meal may also request "individual accommodation to purchase an individual portion of a shelf-stable ceremonial food item for personal consumption" from a commercial vendor.  Inmates requesting an

11

individual accommodation must submit a request identifying:  (1) the specific ceremonial food item requested; (2) the religious/spiritual/ceremonial significance of the food; (3) the source of food item from a commercial food vendor; (4) an individual portion cost; (5) a delivery method and charges; and (6) possible substitutes if the preferred foods are not approved or are unavailable.  If the individual's request is approved, the food item is ordered and processed through the mail room, stored until the time of the annual meal, and distributed by the chaplain on the date of the meal.  Inmates must consume the entire food item during the event or dispose of it at the conclusion of the event, and are not permitted to share the ceremonial foods with other inmates.  DAI 309.61.03.

As the DOC policies stood at trial, therefore, plaintiff and other inmates may obtain game meat or other specifically desired ceremonial foods at the annual Ghost Feast by:  (1) relying on a spiritual advisor or other approved volunteer to bring in a tray of 16 ounces of "spirit foods" to be shared among all attendees at the feast; and/or (2) ordering an individual portion of a shelf-stable ceremonial food item for personal consumption at the feast.  Under the substantial burden prong, the question is then whether plaintiff's religious exercise continues to be substantially burdened despite these two options.

At trial, plaintiff made several arguments as to why his religious exercise was substantially burdened under the new policy, most of which were unsupported by evidence.  First, plaintiff argued that *fresh* game meat must be served at the Ghost Feast, while the new policies would allow only dried or otherwise preserved game meat, but he introduced no evidence that game meat served at the Ghost Feast *must* be "fresh" meat, and his own testimony on the issue was vague and unpersuasive.  One of plaintiff's witnesses, Robert Ryan Krist, suggested that the "spirit foods" already approved under the Property Chart,

12

including dried meat, would be acceptable to use at a Ghost Feast.  (Trial trans., day 1, at 115-16, 122.)   The only evidence potentially supportive of plaintiff's position was the testimony of Dr. Walker, who explained that "the more unadulterated the meat . . . the better," and that "using preparations such as nitrate, for example, in the meat to preserve it might be objectionable."  (*Id.* at 96.)  Even this testimony did not establish that *all* dried or preserved meat would be unacceptable, however, and Dr. Walker later testified that Native Americans have traditionally preserved and dried meats.  (Tr. at 108-09.)  Further, a quick online search for commercially available game meat revealed multiple sources that offer game meat dried without nitrates or other chemical preservatives.[4]   Accordingly, the court finds that DAI policies restricting outside vendors from delivering fresh game meat into the prison does not impose a substantial burden on plaintiff's religious exercise.

Plaintiff's second argument is that the new policies do not allow the possibility that food for the Ghost Feast be provided by a Native American caterer or restaurant.  From his perspective, this would be the best option for supplying food for the Ghost Feast, arguing the food would be fresh, traditional and appropriate, and it would satisfy all of the religious needs of the Native American attendees of the Ghost Feast.  Plaintiff also proposes that the inmates could collect money to pay for this catering.  While the court certainly appreciates that a fully catered fresh meal for attendees of the Ghost Feast would be far preferable for inmates, and even for DOC, if the inmates paid for the food and security concerns could be addressed, the plaintiff has not shown that denying this option imposes a substantial burden

---

[4] *See, e.g.,* http://www.jerky.com/products/all-natural-venison-jerky; http://www.swansonvitamins.com/golden-valley-natural-natural-buffalo-jerky-original-flavor-3-oz-pkg; http://www.elkusa.com/buy_Venison_jerky.htm (sites last visited on November 7, 2016).

on the exercise of his religious beliefs.[5]   In particular, plaintiff offered no evidence establishing that a full meal from a Native American caterer or restaurant is necessary for a religiously significant Ghost Feast, nor that a full *meal* of traditional foods is required at all.

Rather, his own testimony, as well as that of his witnesses, confirm only that a meaningful Ghost Feast must include traditional foods for the benefit of the ancestors, not to satiate the attendees.   Of course, the attendees partake of the traditional foods, but there was no testimony that the traditional foods must be in large enough quantity to comprise an entire meal.   *See, e.g.* Krist at 116, 122 (describing Ghost Feast as including traditional food that is "shared" among participants, and stating that "a Ghost Feast is a simple dish that is passed within").   In other words, attendees of the Ghost Feast do not need to have a full, catered meal of traditional foods provided by a Native American caterer.

That being said, plaintiff and other attendees *must* have the opportunity to partake of traditional foods at the Ghost Feast, and uncertainty remains on this record as to whether DAI's current policies will provide this opportunity.   Under DAI's Religious Property Chart, the quantity of spirit foods that may be brought in by the spiritual advisor is limited to just 16 ounces, or two cups.   While attendees of the Ghost Feast do not need an entire meal, having only two cups of traditional food to share among all attendees is not sufficient. According to defendant's records, there are close to 80 inmates who identify under the Native American religious group at GBCI alone.   (Trial Exh. 527.)   Although not all of the

---

[5] Plaintiff also offered no evidence that this would be a feasible option.   For example, he submitted no evidence of any Native American or other catering company willing and able to provide traditional foods for a Ghost Feast held at the GBCI.   In contrast, defendant presented testimony from Sarah Cooper, the deputy warden at GBCI, that she had attempted to find a caterer or restaurant capable of providing venison Indian tacos for a Ghost Feast and was unsuccessful.   (Trial Trans., day 2, at 128.)

inmates attend the Ghost Feast on an annual basis, arbitrarily limiting the Ghost Feast to 16 ounces of dried meat, corn, berries and water without allowance for the number of attendees is not sufficient, by itself, to ensure that attendees are able to partake of traditional foods at the Ghost Feast.

The DAI's new Religious Diets policy, 309.61.03, which allows inmates to order individual portions of shelf-stable food items for congregate religious celebratory meals, could theoretically be used to supplement the small amount of spirit foods brought in by a spiritual advisor, but the new policy presents its own set of problems.  First, as written, the new policy seems to prohibit inmates from ordering more than *one* food item, even though Native American inmates may require more than one religiously significant food item, such as game meat, corn, berries and fried bread.  Second, although plaintiff could likely find acceptable, shelf-stable game meat to order under the policy, he is unlikely to find *shelf-stable fried* bread that would qualify under the policy.[6]  This is significant because plaintiff testified, and the court has found, that fried bread *is* an essential, traditional food at Ghost Feasts.  Moreover, the Property Chart does not expressly permit spiritual advisors to bring in "fried bread," meaning that plaintiff would be without means to obtain it for the Ghost Feast.[7]  Finally, the

---

[6] The court was unable to find anything resembling a shelf-stable fried bread sold by any online commercial vendor.

[7] Although not clear from the language of the Property Chart itself, nor historical practice, defendant's counsel stated at trial that the property chart *would* permit a spiritual advisor to bring in fried bread under the "sacramental bread" category applicable to all umbrella religious groups. (Trial trans., day 2, at 43-44.)  That category specifically permits a spiritual leader to bring in "one piece of [sacramental bread] for each participant and spiritual leader" for use during congregate services and approved pastoral visits.  (Trial Exh. 503A.)  Whether or not plaintiff or other Ghost Feast attendees consider fried bread to be "sacramental," *defendant's* concession that the Property Chart could technically allow the Native American spiritual leader to bring in fried bread for each Ghost Feast attendee, without apparently raising any security concerns, is significant for purposes of entering an appropriate injunction.

new policy seems likely to interfere with the communal aspect of the Ghost Feast, in that it would result in each attendee, who is able to afford it, opening and consuming a separate food item, rather than inmates partaking in traditional foods together.

Notwithstanding DOC's seemingly good faith effort to develop a "one size fits all" approach under its Property Chart and new Religious Diets policy, the court finds defendant's policies substantially interfere with plaintiff's ability to obtain the traditional foods he needs to have a religiously meaningful Ghost Feast.  Accordingly, plaintiff has shown that defendant's policies impose a substantial burden on his religious exercise.

### C.   "Least Restrictive Means" of Furthering a "Compelling Governmental Interest."

Because plaintiff has met his burden of proving a prima facie case under RLUIPA, the burden shifts to defendant to show that its policies limiting plaintiff's ability to obtain game meat and fried bread are the least restrictive means of furthering a compelling governmental interest.  In evaluating defendant's arguments, the court is mindful that the scrutiny required under the "compelling government interest" standard must be balanced against the deference due prison officials charged with maintaining order.  On one hand, the standard Congress chose is "exceptionally demanding" on the government.  *See Holt*, 135 S. Ct. at 864 ("Congress enacted RLUIPA  . . .  in order to provide very broad protection for religious liberty.").  *Id.* at 859.  On the other hand, the Supreme Court emphasized that "in applying RLUIPA's statutory standard, courts should not blind themselves to the fact that the analysis

is conducted in the prison setting." *Id.* at 866.[8]  When reviewing restrictions on religious exercise in prison, therefore, courts must weigh *both* competing considerations without giving too much or too little weight to one over the other.  *Holt*, 135 S. Ct. at 864 ("Prison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and courts should respect that expertise.  But that respect does not justify the abdication of the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard.").

Here, the relevant policies -- set forth in the Property Chart and Religious Diets policies -- are primarily motivated by six concerns:   (1) health; (2) monetary; (3) administrative; (4) safety; (5) security; and (6) fairness.  Although defendant presented evidence at trial relevant to all of these concerns, the first and second categories were not emphasized.  Defendant presented no evidence of significant health or dietary concerns relating to the contents of a single meal.  As for monetary concerns, the defendant raises this concern in the broadest way possible -- in terms of a slippery slope -- without actually laying out the associated relative costs of an annual meal for each of GBCI's principal religious groups.  Regardless, plaintiff does not argue that the DOC must pay for a Ghost Feast meal, but instead proposes that he and other attendees be permitted to organize and pay for the meal themselves.

This leaves defendant's concerns about administration, safety, security and fairness.  Defendant provided compelling arguments as to why DAI has imposed limitations on bringing outside food into the institution for inmates.  For example, defendant's witnesses

---

[8] In *Cutter v. Wilkinson*, 544 U.S. 709 (2005), the Supreme Court also emphasized the importance of courts giving "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  *Id*. at 722-23.

explained that the new Religious Diets policy allows inmates to acquire religiously significant foods for consumption for the annual celebratory meal, without the real security and administrative challenges that would arise if each inmate were permitted to order an individual meal from a local restaurant, caterer or other commercial vendor.  In particular, unlike shelf-stable food items ordered through the mail from a commercial vendor and processed by the institution's mail department, as permitted under the new policy, individual food portions ordered from a restaurant or caterer would require the prison to implement procedures for arranging delivery or pick-up and inspecting each food item for contraband, not to mention, ensuring that the food is then consumed quickly enough (or otherwise stored safely) to protect against food-borne illness.  Defendant also adequately explained why individual food requests could not be processed in GBCI's prison kitchen, as it lacks equipment necessary to prepare individual meals, such as saute pans, friers or microwaves. (Trial trans., day 2, at 36-37.)

Even so, these concerns do not justify the policies that prohibit vetted and approved spiritual advisors or other volunteers from bringing in a sufficient amount of traditional foods -- game meat with fried bread in particular -- for all Ghost Feast attendees.  For legitimate security and administrative reasons, the DAI may obviously limit the number and quantity of supplies brought into the prison by a spiritual advisor, even one sufficiently vetted to limit the potential security risks, but that is not what plaintiff requires.

Plaintiff's sincere religious needs would be satisfied if the spiritual advisor was permitted to bring in a large enough quantity of spirit foods and fried bread, such that each attendee could consume a meaningful amount, though not necessarily an entire meal.

In contrast, defendant's Property Chart limits spirit foods to the seemingly arbitrary quantity of 16 ounces, regardless of the number of inmates attending a congregate religious service.  Defendant gave no persuasive explanation for this limitation; nor did defendant explain why fried bread was not specifically included as a food that could be brought in by a spiritual advisor to a congregate meal.  On the contrary, defendant conceded that its own staff will bring in pizzas for inmates at various times for fundraising and morale purposes.

Finally, defendant proposed at trial that fairness concerns dictated the Property Chart allowances.  Specifically, defendant suggested that the allowance of spirit foods in the Property Chart is comparable to the "Seder plate" allowed for Jewish inmates, which a Jewish spiritual advisor may bring to share among all the participants at the annual congregate Passover observance.  The Property Chart requires that this plate be brought in on the day of service, and be a vendor-sealed, commercially available package.  The Seder Plate may contain up to six traditional items, including: Chazeres (bitter herbs, horseradish, romaine); Charoses (mixture of chopped nuts, grated apples, cinnamon, wine, dates, honey); Karpas (Parsley, celery or potato dipped in salt); Z'roa (lamb or goat shankbone, chicken wing, or chicken neck); Beitzah (hard-boiled egg); and Matzah.  (Trial Exh. 503A.)  Defendant's position is that because Jewish inmates are limited to one Seder Plate to be shared among participants at the annual congregate meal, Native American inmates must also be limited in the amount of spirit foods available at the Ghost Feast.

Without deciding whether the notion of "fairness" among inmates of various religious groups may be a compelling government interest, may prove impractical when it comes to the Property Chart, since the sincere religious beliefs of each religious group necessarily vary in substantial ways, as still the "least restrictive means" to accommodate those beliefs.  For

19

example, setting aside for another case the question whether a single shared Seder plate is sufficient to meet the religious needs of Jewish inmates, the fact is that the Property Chart does not limit Seder plates to the same extent it limits spirit foods.  First, the Seder plate is *not* limited to a seemingly arbitrary 16 ounces; in fact, nothing in the Property Chart states what size the Seder Plate must be.[9]  Second, the food on the Seder plate does not have to be "shelf stable," like the spirit foods do.  Willard-West testified that there were no security or safety concerns with a non-shelf stable Seder plate because the food is brought in by a spiritual leader and consumed on the same day.  (Trial trans., day 1 afternoon, at 122.)  But then what of the security or safety concerns that prevent a Native American spiritual advisor from bringing in non-shelf stable fried bread for the annual Ghost Feast?[10]

In sum, the court is not persuaded that defendant's policies reflect the least restrictive means of furthering a compelling government interest.  As discussed in detail below, there are less restrictive means by which defendant can achieve its goals of safety, security and fairness while also accommodating plaintiff's sincerely held religious beliefs.  Acknowledging that requiring greater care in addressing group, and individual, religious beliefs will further tax an already overtaxed staff and underfunded DOC, the court is hopeful that some individual accommodation will add to the value of the religious celebration for participating inmates, which after all is the goal of RLUIPA, both out of respect for that specific ceremony and

---

[9] Even if the Property Chart were amended to require the Seder plate to be limited to 16 ounces, there would be questions about fairness, given that there are only 18 inmates identifying as Jewish at GBCI, compared to 78 Native American inmates.  (Trial Ex. 527.)

[10] The same question could be asked regarding non-shelf stable game meat and other spirit foods. This question need not be addressed here, however, because plaintiff has not shown that his religious exercise would be substantially burdened by denial of access to fresh game meat, as discussed above.  Of course, the DOC might still be well served by allowing fresh game meat out of its fairness concern or simply to make the Ghost Feast more memorable for its participants.

religion, as well as for the dignity associated with being allowed to practice one's faith, even behind bars.

### D.    Remedy.

In light of the findings above, plaintiff is entitled to injunctive relief under RLUIPA. The court concludes that plaintiff's religious beliefs can, however, be satisfied by a relatively simple accommodation, that should not impose a significant burden on defendant. Specifically, defendant must permit a spiritual advisor or volunteer to bring traditional foods for the Ghost Feast in sufficient quantity such that plaintiff and every other attending inmate are able to partake of a meaningful amount.  The specific amount shall be left up to the discretion of the spiritual advisor or volunteer, although the traditional foods should include the spirit foods identified on the current Property Chart, as well as fried bread, if available, whether or not shelf-stable.  If there is no spiritual advisor or volunteer available to bring traditional foods for the Ghost Feast, individual inmates may avail themselves of the option to order their own food items for consumption consistent with the new Religious Diets policy.

The court is aware that this injunction will likely please neither side.  Defendant may feel that this will open up the proverbial floodgates to other inmates who wish to have particular foods brought in by a spiritual advisor for their celebratory meal, or that it may lead to disputes among inmates regarding which foods are most religiously significant. Defendant presented no evidence to substantiate such concerns, however, and the court concludes only that this is the most appropriate solution for the Native American Ghost Feast at issue in this case.

21

For plaintiff, this solution does not provide him with the fresh venison Indian taco, cooked by a Native American caterer, that he desires. Nor will this solution address his concerns about perceived disrespect of Native American beliefs by the DOC more generally. This relief does resolve plaintiff's claim for purposes of RLUIPA, however, as well as being narrowly tailored enough to satisfy the restrictions on injunctive relief set forth in the PLRA. 18 U.S.C. § 3626(a). Finally, acknowledging its limitations, the court is also hopeful that this case will encourage all those involved to approach similar disputes in the future by engaging in more open communication with outside spiritual advisors and inmates, in order to find more creative solutions that could be implemented to allow inmates to practice sincerely held religious beliefs while also protecting legitimate governmental interests.

ORDER

IT IS ORDERED that:

(1) Plaintiff has proven that defendant violated his rights under RLUIPA by failing to accommodate his requests for (a) a multi-colored headband, and (b) game meat and fried bread at the annual Ghost Feast.

(2) The court enters the following permanent injunction:

(a) Plaintiff shall be allowed to possess one headband identified as the "Four Directions" headband in the colors of red, yellow, black and white (contained in Dkt. #69, Trial Ex. 536), for use in his cell and at congregate Native American religious services and study groups. The headband may be replaced from time to time. Plaintiff's use of the headband must, however, abide by all other applicable institution policies and procedures. Should plaintiff be found to be using his headband in a manner that violates institution policies or procedures, he may be required to relinquish the headband and dispose of it according to DAI Policy 309.20.03. He must also dispose of the previous turquoise headband he possesses.

      (b)     Defendant shall allow an approved Native American spiritual advisor or other approved volunteer to bring traditional foods for the annual Native American Ghost Feast at Green Bay Correctional Institution in sufficient quantity such that plaintiff and every other attending inmate is able to partake of a meaningful amount of traditional foods. The specific amount shall be left up to the discretion of the spiritual advisor or volunteer. The traditional foods should include the spirit foods identified on the current Religious Property Chart, as well as fried bread, if available, which need not be shelf-stable.

      (c)     If there is no spiritual advisor or volunteer available who can provide the traditional foods for the annual Ghost Feast in sufficient quantity, plaintiff and other interested inmates may order their own meal consistent with the new Religious Diets Program.

(3)     The clerk of court is directed to close this case.

Entered this 8th day of November, 2016.

BY THE COURT:

/s/

_____

William M. Conley
District Judge

23