IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

DAVID SCHLEMM,

          Plaintiff,                                     OPINION AND ORDER

        v.                                          11-cv-272-wmc

JON E. LITSCHER,

          Defendant.
_____

After a bench trial in March of 2016, this court found that the Wisconsin Department of Corrections ("DOC") violated inmate David Schlemm's rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") by failing to accommodate his requests for a multi-colored headband, game meat and fried bread at the annual Ghost Feast.[1] (Dkt. #211.) The court then entered an injunction requiring defendant to: (1) permit Schlemm to possess a "Four Directions" multi-colored headband, and (2) make accommodations that would permit Schlemm to obtain traditional foods he needs to hold a meaningful Ghost Feast at the Green Bay Correctional Institution. (*Id*.) Still pending before the court are three, post-judgment motions filed by plaintiff: (1) a motion to alter or amend the injunction to allow *fresh* foods at the Ghost Feast to be brought in by a volunteer, local tribes or a caterer (dkt. #214); (2) a motion for contempt regarding defendant's alleged refusal to notify spiritual volunteers of the court's injunction

_____

[1] Plaintiff Schlemm was originally granted leave to proceed on a claim against the DOC Secretary, Edward Wall in his official capacity. (Dkt. #3.) Wall was later substituted for the current Secretary, Jon E. Litscher. (Dkt. #200.)

in time for the 2016 Ghost Feast ceremony (dkt. #232); and (3) a motion for contempt regarding defendant's alleged failure to allow plaintiff to possess the Four Directions headband (dkt. #249). More recently, the plaintiff also filed a motion for assistance in recruiting counsel going forward. (Dkt. #262.)

For the reasons that follow, the court will deny all of plaintiff's post-judgment motions. The court will also deny his request for assistance in recruiting counsel to assist him with further proceedings in this case, if any, because: (1) plaintiff has previously proven unable to work with appointed counsel in the past; (2) he has shown an exceptional ability in representing himself; and (3) his post-trial motions have no merit.

## OPINION

### I. Plaintiff's Rule 59 Motion to Alter or Amend Judgment

Plaintiff seeks relief from judgment under Rule 59(e) of the Federal Rules of Civil Procedure. "Courts may grant Rule 59(e) motions to alter or amend the judgment if the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest error of law or fact." *Miller v. Safeco Ins. Co. of Am.*, 683 F.3d 805, 813 (7th Cir. 2012) (citation omitted). "But such motions are not appropriately used to advance arguments or theories that could and should have been made before the district court rendered a judgment, or to present evidence that was available earlier." *Id.* Rule 59 motions also should not be used to reargue the merits of the case. *See Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 368 (7th Cir. 2003).

Specifically, plaintiff's motion asks the court to amend its permanent injunction to provide that: (1) Native American volunteers be allows to bring in *fresh* game meat for the Ghost Feast; and (2) if the Native American volunteer cannot or chooses not to provide foods for the Ghost Feast, to permit "the Tribes of the State of Wisconsin to donate these Fresh foods or allow the Native American group as a whole to send monies from family and friends to Carol's Fry Bread caterer or another respected caterer/restaurant." Additionally, plaintiff argues that the trial should be reopened because defendant improperly threatened one of his potential witnesses.[2]

Because plaintiff failed to point out any manifest errors of law or fact, and he failed to submit any admissible evidence that was not available at the time of trial, his motion to amend the injunction must be denied. Additionally, plaintiff offers no evidence showing any improper threats by DOC to his witnesses. Accordingly, his Rule 59 motion identifies no basis for relief.

## A. Necessity of Fresh Game Meat at the Ghost Feast

Plaintiff established at trial that his requests for venison or other game meat and fried bread at the annual Ghost Feast were motivated by sincerely held religious beliefs. (Dkt. #211 at 7.) The court concluded, however, that plaintiff failed to prove his sincere

---

[2] Plaintiff also argues that GBCI, where he is housed, has changed its policies regarding Sweat Lodge and Pipe and Drum ceremonies in a way that diminishes the value of these ceremonies. However, these issues are not before the court as a matter of law of the case because plaintiff was not permitted to proceed to trial in this case on claims concerning the Sweat Lodge or Pipe and Drum ceremonies. Rather, as the court has already explained numerous times, the only claims remaining in this case after remand from the Seventh Circuit were plaintiff's claims for injunctive relief for (1) venison during the Ghost Feast; and (2) a multicolored headband to wear in his cell and during religious ceremonies. (*See, e.g.* dkt. #171 at 2.)

religious beliefs require that *fresh* game meat be served at the Ghost Feast, or that at minimum dried or otherwise preserved game meats are unacceptable. On this point, the court explained:

> [Plaintiff] introduced no evidence that game meat served at the Ghost Feast must be "fresh" meat, and his own testimony on the issue was vague and unpersuasive. One of plaintiff's [own] witnesses, Robert Ryan Krist, suggested that the "spirit foods" already approved under the Property Chart, including dried meat, would be acceptable to use at a Ghost Feast. (Trial trans., day 1, at 115-16, 122.) The only evidence potentially supportive of plaintiff's position was the testimony of Dr. Walker, who explained that "the more unadulterated the meat . . . the better," and that "using preparations such as nitrate, for example, in the meat to preserve it might be objectionable." (Id. at 96.) Even this testimony did not establish that all dried or preserved meat would be unacceptable, however, and Dr. Walker later testified that Native Americans have traditionally preserved and dried meats. (Tr. at 108-09.) Further, a quick online search for commercially available game meat revealed multiple sources that offer game meat dried without nitrates or other chemical preservatives. Accordingly, the court finds that DAI policies restricting outside vendors from delivering fresh game meat into the prison do not impose a substantial burden on plaintiff's religious exercise.

(*Id.* at 12.)

Plaintiff maintains that the court's conclusions are erroneous for several reasons. First, he says that the trial testimony of Dr. Walker and inmate Johnson Greybuffalo support a finding that Ghost Feast foods must be fresh. However, even plaintiff concedes that neither witness testified that the foods must be "fresh" and not preserved; rather, they testified only that the foods must be "traditional" foods consumed by Native people. (Trial Trans., day 1, at 38-39, 41-42, 94, 110.) Next, plaintiff points out that inmates Jose Villarreal and David Doxtater testified at trial that, several years ago, DOC permitted

outside tribes to donate food for the Ghost Feast. Again, however, neither inmate testified that preserved or shelf stable foods would be inadequate for a meaningful Ghost Feast, nor do any of the references on Ghost Feasts support that finding.

Plaintiff further objects to the court's suggestion that there are shelf stable game meats that are commercially available and do not contain nitrates or other chemical preservatives. Plaintiff asserts that if a dried meat lists "salt" as an ingredient, the meat *may* contain a nitrate or nitrite. Plaintiff is mistaken. Under federal labeling laws, meat products using nitrates or nitrites as preservatives must identify those preservatives on the label. *See* 21 C.F.R. § 101.22. For example, as the court explained previously, the website www.jerky.com offers several game meat products that are advertised as "all natural," which contain salt but not nitrates or nitrites. In contrast, the website also offers products that are not advertised as "all natural" and that specifically identify "sodium nitrite" as an ingredient. *See* http://www.jerky.com/jerky-com-nutritional-information. In other words, plaintiff's argument that he cannot consume a product that lists "salt" as an ingredient because it might actually contain a chemical preservative has no factual underpinnings.

Finally, plaintiff argues that this court was required to credit his testimony as to his own sincere religious belief that a Ghost Feast required fresh foods without chemical preservatives *or* any salt at all. As the trier of fact, however, it was this court's obligation to assess the credibility of the testimony and to weigh plaintiff's testimony against all of the other testimony and evidence submitted during trial. *See United States v. Carraway*, 312 F.3d 642, 645 (7th Cir. 2010) (trial court is the "trier of fact" at a bench trial and must make credibility determinations). Here, plaintiff introduced neither witness testimony nor

documentary evidence at trial to support a conclusion that traditional Ghost Feast foods must be "fresh" and cannot contain preservatives or salt. And, again, one of plaintiff's own witnesses, this time Johnson Greybuffalo, stated that salt is actually one of the ingredients of fry bread. (Trial Trans., day 1, at 39.) As for plaintiff's own testimony on this issue, he never testified clearly as to why he believed the game meat had to be fresh and preservative-free, and he *never* stated at trial that Ghost Feast food cannot contain salt.

Rather, plaintiff's only testimony on this topic consisted of the following exchange:

Court:      The game meat as I understand it, it could be a dried venison as long as it's not -- there are no preservatives involved. Would you agree?

Plaintiff:  I disagree.

Court:      And what is that based [on]?

Plaintiff:  Well, I mean, I guess what I'm saying Your Honor, is are you talking about like a vendor sealed without the preservatives?

Court:      Yes.

Plaintiff:  Well, I mean, the reason I disagree is because once I have it, I can't cook it. I can't do anything with it. But just have a piece of meat.

Court:      Right.

Plaintiff:  And that's why I disagree.

Court:      And so – but I'm asking – I didn't hear that from your expert. I didn't hear it from anyone else who testified that it has to be a cooked meat in order to be religiously significant. In other words, it has to be a game meat but there – no one testified that it's a belief that it has to be cooked or served in that way.

Plaintiff:  I guess that would have been a good question to ask them.

> Court:        Well, more importantly, is there something that you point to in the materials provided by your expert or in literature that suggests that it's not an adequate Ghost Feast if the food, particularly the game meat, is not fresh and able to be cooked or that it needs to be cooked at that time?
>
> Plaintiff:        Not that I know right now, sir.

(Trial trans., day 2 at 41-42.)

Plaintiff provided no further testimony during the trial on his own belief that certain preparations of food are required for a meaningful Ghost Feast or that preserved foods would be inadequate.  Nor did he explain the basis for these beliefs.  The court remains convinced that plaintiff's testimony on this issue was unpersuasive and was insufficient to established that the DOC's policies permitting only shelf-stable venison would "seriously violate" his sincerely held religious beliefs, as required to show a RLUIPA violation.  *See Schlemm v. Wall*, 784 F.3d 362, 364 (7th Cir. 2015).

Nor does plaintiff's "new" evidence change the court's ultimate factual finding.  In his motion to amend the judgment, plaintiff points to a document from the Oneida Tribe that purportedly supports his belief that Ghost Feast foods cannot contain any salt.  (Dkt. #214 at 10.)  If plaintiff believed such evidence was significant to his claim, however, he should have introduced it at trial.  Plaintiff provides no explanation for his failure to do so, and certainly has not suggested that this evidence was unavailable at the time of trial.  Thus, this evidence cannot be the basis of a Rule 59 motion.

### B. Request to Allow a Catering Company or Local Tribe to Provide Food

Plaintiff next argues that the injunction should be amended to permit Native American inmates to obtain food for the Ghost Feast from local tribes or a catering company. The court rejected this argument at trial, stating as follows:

> Plaintiff's second argument is that the new policies do not allow the possibility that food for the Ghost Feast be provided by a Native American caterer or restaurant. From his perspective, this would be the best option for supplying food for the Ghost Feast, arguing the food would be fresh, traditional and appropriate, and it would satisfy all of the religious needs of the Native American attendees of the Ghost Feast. Plaintiff also proposes that the inmates could collect money to pay for this catering. While the court certainly appreciates that a fully catered fresh meal for attendees of the Ghost Feast would be far preferable for inmates, and even for DOC, if the inmates paid for the food and security concerns could be addressed[. However,] the plaintiff has not shown that denying this option imposes a substantial burden on the exercise of his religious beliefs. In particular, plaintiff offered no evidence establishing that a full meal from a Native American caterer or restaurant is necessary for a religiously significant Ghost Feast, nor that a full meal of traditional foods is required at all.
>
> Rather, his own testimony, as well as that of his witnesses, confirm only that a meaningful Ghost Feast must include traditional foods for the benefit of the ancestors, not to satiate the attendees. Of course, the attendees partake of the traditional foods, but there was no testimony that the traditional foods must be in large enough quantity to comprise an entire meal. *See, e.g., Krist* at 116, 122 (describing Ghost Feast as including traditional food that is "shared" among participants, and stating that "a Ghost Feast is a simple dish that is passed within"). In other words, attendees of the Ghost Feast do not need to have a full, catered meal of traditional foods provided by a Native American caterer.

(Dkt. #211 at 13-14.)

8

The court further noted that plaintiff failed to prove that providing a fully catered meal would even be a feasible option. In particular, "he submitted no evidence of any Native American or other catering company willing and able to provide traditional foods for a Ghost Feast held at the GBCI." (*Id.*) In contrast, "defendant presented testimony from Sarah Cooper, the deputy warden at GBCI, that she had attempted to find a caterer or restaurant capable of providing venison Indian tacos for a Ghost Feast and was unsuccessful." (*Id.*)

In his Rule 59 motion, plaintiff argues that the court erred in finding food brought in by the spiritual advisor or ordered from a commercial vendor can satisfy his religious needs. In particular, plaintiff argues that the spiritual advisors may not be able to obtain necessary foods; and if not, the DOC's policies permitting inmates to order religiously significant food is inadequate because (1) the food must be shelf stable and (2) it may not arrive in time for the Ghost Feast. Plaintiff claimed that two pagan inmates attempted to order food for their annual feast, and they were investigated by security, thereby delaying receipt of the food beyond the date of their feast.

Still, the evidence in the record does not support plaintiff's arguments. As an initial matter, the court's permanent injunction has been in place only for the 2016 Ghost Feast. Before that feast, GBCI contacted Native American volunteer Chuck Davis and advised he could bring spirit foods and fry bread. (*See* Michelle Haese Decl., dkt. #230, ¶ 4.) GBCI also contacted plaintiff and asked whether he wanted to order a ceremonial food item for the feast, but he declined. (*Id.* at ¶ 8.) Ultimately, the feast was held on November 26, 2016, and the participants had a ceremony, sweat lodge, and communal meal in the dining

hall that consisted of beef stew, biscuits, vegetable salad, pears, and a dessert bar. Each participant also received a piece of fry bread brought by Davis. Ironically, plaintiff declined to attend any of the 2016 Ghost Feast events.

In light of the fact that plaintiff did not attend the Ghost Feast, and that he did not attempt to use the DOC's procedures for ordering a food item for the feast, his arguments that the injunction is inadequate ring hollow at best. If plaintiff had made an effort, he may well have been able to order a game meat item, partake of the fry bread brought by Mr. Davis, and participate in the Ghost Feast celebration with the other Native American inmates. Instead, as plaintiff has done in previous years, he refused to participate on the grounds that the Ghost Feast was not exactly as he believes it should be. Without having at least attempted to obtain celebratory food items under the DOC procedures, however, plaintiff has no credible basis to argue that the court's injunction will not work for him.

Moreover, as the court explained above, plaintiff did not prove at trial that his sincere religious beliefs require him to have a fully catered meal as part of the Ghost Feast. Thus, his arguments as to the viability of obtaining a catered meal are largely irrelevant. Nonetheless, the court will address them briefly for the sake of completeness.

First, plaintiff argues that the court disregarded evidence of potential caterers that could provide Ghost Feast food at GBCI. In particular, he provided a list of six potential caterers or local restaurants in a pretrial filing, as well as his testimony at trial that a catering service helped provide food to the prison in 1997. However, a list of restaurants and catering companies -- which was not introduced as evidence at trial and that may or may not have the capability of catering a Ghost Feast -- is not the same as submitting *evidence*

of a catering company that could in fact provide food for a Ghost Feast.  The court gave plaintiff the opportunity to provide such evidence at trial, but he failed to do so.

Second, the court specifically asked plaintiff whether there is "a caterer who would provide such a meal?"  (Trial Trans., day 2, at 46-47.)  Plaintiff responded that he was "sure [he] could find one," but that he "would rather have somebody within our spiritual advisers do that.  This way [plaintiff would] have nothing to do with that and security can't say that [he] suggested it."  (*Id.*)

Third, in his Rule 59 motion, plaintiff represents having now identified a company -- Carol's Fry Bread -- that could cater the Ghost Feast at GBCI.  However, the time for plaintiff to submit such evidence was at trial.  If he had done so, the court and parties could have explored whether catering by this company would be possible, especially in light of security, financial and administrative concerns.  Now, however, it is too late.  For all of these reasons, therefore, plaintiff has not shown a basis for altering the injunction to permit local tribes, catering companies or restaurants to provide a meal for the Ghost Feast.

### C.  Alleged Threats to Randy Cornelius

Finally, plaintiff argues that he could have submitted further evidence in support his claim at trial through the testimony of Randy Cornelius, but for the defendant warning Cornelius that he would no longer be welcome at GBCI if he testified.  Plaintiff argues that defendant should be sanctioned and the trial reopened as a result of these alleged threats.

This argument also flounders on a number of levels.  As an initial matter, plaintiff has submitted no admissible evidence in support of his allegation that DOC threatened

Randy Cornelius.  Rather, plaintiff's allegation is supported solely by hearsay statements in several identical declarations signed by inmates.

In contrast, defendant submitted an email exchange between Cornelius, GBCI's chaplain Michael Donovan, and DAI's Religious Practice Coordinator Kelli West, regarding Cornelius's potential testimony on behalf of plaintiff.  (Dkt. #235-1.)  This email exchange was initiated *by Cornelius*, who wrote to Donovan on August 5, 2015, as follows:

> Question for you.  I've been contacted by David [Schlemm's] lawyer to write an expert report on his pending court case about feast foods and ceremonial headgear.  Would this jeopardize the volunteer work that I do @ GBCI?  I haven't committed to writing the letter, thought I'd better check with the "expert" first...............

Donovan responded that he did not think it would jeopardize Cornelius's volunteer work, but forwarded Cornelius's email to Kelli West for further confirmation.  West thanked Cornelius for his volunteer work and for asking in advance of providing testimony for plaintiff.  She then wrote, in pertinent part:

> Mr. Schlemm's attorney is asking you to provide your personal opinions regarding the claims Mr. Schlemm has made in his civil litigation against DOC.  He is not asking you to serve as a representative of DOC or GBCI on policy matters.  As a free citizen, you may choose to serve as an expert witness in civil litigation or not to serve in this capacity, at your own discretion.  Based upon review of the DAI volunteer policy, DOC cannot prohibit you from acting as an expert witness on behalf of Mr. Schlemm if you choose to do so.

(*Id.*)  West went on to note, however, that Cornelius may wish to consider potential challenges that could arise if he acted as an expert witness, including, among other things: (1) whether his testimony would interfere with his role in providing spiritual care to

plaintiff or other inmates; (2) that defendant may attempt to discredit his testimony through cross-examination or through other witnesses, which could affect the way inmates or DOC staff perceive his role; and (3) that other inmates may request his assistance in future litigation, which could take time away from his ability to provide spiritual care and programming to GBCI inmates.  (*Id.*)

The tone of West's email is not threatening or demeaning.  Rather, West's email appears to be a thoughtful response to Cornelius's question.  Which brings up the final flaw in plaintiff's argument:  at the time of these exchanges with plaintiff's counsel and DOC with Cornelius, plaintiff was being represented by outstanding lawyers who agreed to take his case through trial at the court's request after remand by the Seventh Circuit Court of Appeals.  In turn, those attorneys successfully recruited an impressive expert, Dr. Deward Walker, who testified at trial about the nature of the Ghost Feast and prison practices.  At no time did counsel raise concerns about an inability to recruit experts effectively, much less that their efforts to recruit Cornelius in particular was blocked by DOC.  For plaintiff to do so now, after effectively dismissing his recruited counsel, rings hollow at best.  Regardless, plaintiff's lack of admissible evidence of improper threats or actions dooms his request to reopen the trial or alter the judgment on this basis as well.

## II. Plaintiff's Motions for Contempt

In addition to his Rule 59 motion, plaintiff filed three motions for contempt, in which he argues that defendant violated this court's preliminary and permanent injunction. A court's civil contempt power rests in its inherent authority to enforce compliance with

court orders and ensure judicial proceedings are conducted in an orderly manner. *See Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 737-38 (7th Cir. 1999); *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir. 1993); *Ferrell v. Pierce*, 785 F.2d 1372, 1378 (7th Cir. 1986). To hold a party or witness in civil contempt, "the district court must be able to point to a decree from the court which 'set[s] forth in specific detail an unequivocal command' which the party [or witness] in contempt violated." *Ferrell*, 785 F.2d at 1378; *see also United States v. Dowell,* 257 F.3d 694 (7th Cir. 2001).

### A. November 2016 Ghost Feast (Dkt. #232)

Plaintiff argues that defendant violated the court's injunction by: (1) not allowing Native American volunteer Randy Cornelius to conduct the 2016 Ghost Feast; (2) not contacting Cornelius about the Ghost Feast Ceremony or the court's injunction; and (3) not informing Native American volunteer Chuck Davis of the terms of the court's permanent injunction before the 2016 Ghost Feast. Plaintiff's arguments fail for multiple reasons.

Plaintiff's first and second arguments fail because this court's injunction did not require defendant to contact a specific Native American volunteer, nor Mr. Cornelius in particular, regarding the Ghost Feast. At *no* point in this case did plaintiff assert a claim concerning which volunteer should be permitted to conduct the Ghost Feast, nor whether Mr. Davis was qualified to conduct the Ghost Feast. Therefore, defendant cannot be found in contempt for failing to contact Cornelius or for failing to ensure that the Ghost Feast

included certain prayers and ceremonies. If anyone, this obligation fell on the participants to insure the Ghost Feast was meaningful *to them*.

Moreover, defendant's evidence shows that Cornelius, as well as Davis, *were* informed of the court's November 8, 2016, permanent injunction before the 2016 Ghost Feast. Although these volunteers were notified of the injunction on November 21, only a few days before the November 26 Ghost Feast, Davis was able to bring in homemade fry bread for the feast. (*See Haese Decl.*, dkt. #230, ¶¶ 3, 4, 10.) Plaintiff's arguments to the contrary are based solely on hearsay statements with no admissible evidentiary support.

One additional note: DOC's policy permitting inmates to order a shelf-stable ceremonial food for their celebratory feast was in place several months before the November 2016 Ghost Feast and this court's permanent injunction. Thus, although Davis apparently could not provide venison or other game meat for the 2016 Ghost Feast participants, the participants could have ordered game meat for use at the ceremony from a commercial vendor. As discussed above, plaintiff's failure to use this procedure, much less even attend the Ghost Feast, undermines his contention that defendant should be held in contempt.

Had plaintiff provided proof of his trying to work with GBCI's chaplain or DAI's religious practice coordinator to insure as meaningful a Ghost Feast as practical, or even communicate constructively with them or with an outside volunteer like Davis or Cornelius, and that those efforts were unreasonably blocked, then plaintiff may have an argument. Unfortunately, this case has been marked by repeated instances of plaintiff refusing to compromise, even with his own counsel. In this, the court does not mean to

criticize the fervor of plaintiff's own religious beliefs, which are, of course, fully protected by the First Amendment from interference by the state. Only to explain that DOC's obligation is not to support all nuances of his religious practices, but rather to reasonably accommodate those that are sincerely held and being seriously violated. Accordingly, his motion for contempt relating to the 2016 Ghost Feast will be denied.[3]

### B. Interference with Headband (Dkt. #249)

Plaintiff also moves for contempt based on defendant's alleged interference with his wearing a colored headband during religious ceremonies. In particular, he alleges that: (1) on November 7 and December 19, 2015, defendant refused to allow him to wear his headband at a "Sweat Lodge congregation meal"; and (2) on March 25, 2017, Chaplain Michael Donovan removed his multicolored headband during a Sweat Lodge ceremony.

As an initial matter, it is not clear why plaintiff waited until months after judgment was entered to raise his concerns about events that happened in 2015, well before the trial in this case. Indeed, the court gave plaintiff the opportunity to raise any concerns related to the headband issue at the final pretrial conference, but he failed to do so. (Dkt. #188.)

Moreover, plaintiff's allegations regarding the 2015 instances do not support a finding of contempt. Both the court's preliminary and permanent injunctions in this case

---

[3] With the fall season now officially upon us, and the last humid, hot days waning, perhaps plaintiff can still find a way to work anew and cooperatively with other inmates, and even more importantly with volunteers who have established a rapport with DOC representatives, to marry one of the monthly Sweat Lodge ceremony with a Ghost Feast that is acceptable, if understandably not meeting a standard that can be achieved by those enjoying the greater liberties afforded outside of prison walls.

require defendant to permit plaintiff to wear his headband in his cell and during religious ceremonies. (Dkt. ##100, 211.) Although plaintiff contends that he should have been permitted to wear his headband during the meal held *after* the monthly Sweat Lodge ceremonies, defendant argues the post-Sweat Lodge meal is not a "religious ceremony." As addressed in earlier decisions, this is consistent with DAI policy permitting each religious group to have a single, annual congregate meal. *See* DAI Policy No. 309.61.03. For Native American inmates, the annual congregate meal is the Ghost Feast.[4]

Plaintiff clearly disagrees with DAI's characterization of the post-Sweat Lodge meal as a non-religious gathering. He also objects to the restructuring of Sweat Lodge activities. However, these objections are based on his beliefs regarding the requirements for a meaningful Sweat Lodge, and are not really about whether defendant violated the injunction relating to plaintiff's headband. As the court has explained several times, plaintiff asserted no claims in this case regarding the Sweat Lodge ceremony. Nor did he assert any claims regarding DAI's policies limiting religious groups to one annual celebratory meal. Accordingly, his motion for contempt based on those arguments will also be denied.

---

[4] The post-Sweat Lodge meal held at GBCI (since eliminated) was not a "religious meal" under DOC policies, but was scheduled based on GBCI's logistical needs. (*See* Donovan Decl., dkt. #252, ¶ 2.) In particular, the meal was scheduled directly after the Sweat Lodge to facilitate inmate movement at proper times and because there was not sufficient time for the inmates to shower between the Sweat Lodge and dinner. GBCI felt this would reduce the chances that other inmates would complain about eating dinner with inmates who had recently attended Sweat Lodge. (*Id.*) GBCI has since changed the procedures for Sweat Lodge, giving inmates time to shower and return to their units after the ceremony in time for dinner with their living unit. (*Id.* ¶ 7.)

Likewise, plaintiff's allegations regarding the March 2017 incident do not support a finding of contempt. While defendant concedes that Chaplain Donovan incorrectly confiscated the headband plaintiff had ordered in accordance with the court's injunction, defendant also credibly represents that Donovan mistakenly believed plaintiff was not permitted to have the new headband because he had formerly worn a turquoise headband. (*See* Donovan Decl., dkt. #252, ¶ 9.) After learning that plaintiff was indeed allowed the multicolored headband, Donovan returned the headband with his apologies. (*Id.*) Moreover, plaintiff was deprived of the headband for no more than four hours. Such a temporary mistake does not support a finding of contempt. Accordingly, plaintiff's motion for contempt based on interference with his wearing a multicolored headband will be denied.

### C. Transfer to CCI (dkt. #266)

In his most recent motion for contempt, plaintiff complains that defendants' plan to transfer him to Columbia Correctional Institution ("CCI") violates the injunction. As acknowledged in defendant's response brief, Schlemm asked for a transfer, albeit to a medium security facility in Racine, which was approved on September 19, 2017, for CCI instead, based on a recommendation from the program review committee. Defendant further represents that "[t]he Department is aware of the Court's order and prepared to implement it at Columbia upon Schlemm's transfer." (Def.'s Resp. (dkt. #271) 4.) Based on this representation and others made in defendant's response brief, there is no basis for

Schlemm's apparent concern that CCI will be unable or unwilling to comply with the permanent injunction. As such, the court will deny this motion for contempt as well.

## ORDER

IT IS ORDERED that plaintiff David Schlemm's motion to alter or amend the judgment (dkt. #214), motions for contempt (dkt. ##232, 249, 266), and motion for assistance in recruiting counsel (dkt. #262) are DENIED.

Entered this 26th day of September, 2017.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge